

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE SEP 1 2 2019
Fairhurst, CJ
CHIEF JUSTICE

This opinion was
filed for record
at 8am on Sep 12, 2019
Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 96354-1 |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| A.M., a minor, | ) | |
| | ) | |
| Petitioner. | ) | Filed __SEP 1 2 2019__ |
| | ) | |

MADSEN, J.—A.M., a juvenile, appeals an unpublished Court of Appeals decision affirming her conviction for possession of a controlled substance. First, A.M. argues that it was manifest constitutional error for the trial court to admit a detention center inventory form where she signed a sworn statement indicating that a backpack, which was discovered to contain methamphetamine, was her property because it violated her right against self-incrimination. Second, A.M. argues that the affirmative defense of unwitting possession is an unconstitutional burden-shifting scheme that violates her due process rights.

We hold the admission of the inventory form is manifest constitutional error because it violated her right against self-incrimination and warrants reversal because it is not harmless error. Because we find reversible constitutional error, we decline to consider A.M.'s due process argument and remand the case back to the trial court for further proceedings consistent with this opinion.

## FACTS

### Background Facts

A.M. entered a Goodwill store with two other women, a juvenile and an adult, pushing a shopping cart with a backpack in it. The adult woman put two Halloween costumes in the cart, and A.M. opened the large pocket of the backpack to put the costumes in. The loss prevention officer observed the entire incident on the security cameras in the store. As the three women were leaving the store without paying for the costumes, A.M. put the backpack on her back. The loss prevention officer stopped A.M. just outside of the store. A.M. was detained and escorted to Goodwill's security room to await police officers. When police arrived, they arrested A.M. for theft.

In a search incident to the arrest, police also searched the backpack and, in one of the smaller outer pockets, found a prescription bottle that looked to be a marijuana dispensary bottle filled with what appeared to be several little "baggies" inside. The officer believed it was methamphetamine and took the baggies for further testing. The substance was confirmed to be methamphetamine.

A.M. was booked in the juvenile detention center. At some point after her arrest, but prior to being booked, A.M. invoked her *Miranda*[1] rights. A.M. was required to sign an inventory form accounting for her belongings, which read, "I have read the above accounting of my property and money and find it to be accurate. I realize that property not claimed within 30 days will be subject to disposal." Ex. Transmittal Certificate, Ex. 3. When released, A.M. signed the same form, which stated, "I have received the above listed property." *Id.* The backpack was listed in the inventory form as part of A.M.'s belongings.

Procedural Facts

A.M. was charged with one count of third degree theft and one count of possession of a controlled substance. Clerk's Papers (CP) at 54-55. The case proceeded to bench trial. At trial, the State sought to admit the detention center inventory form, which indicated the backpack was A.M.'s property. The trial court admitted the form over defense counsel's objection.

A.M. also raised the unwitting possession affirmative defense. She testified that she had no knowledge of the methamphetamine in the backpack and that she got the backpack from the other juvenile's home. Verbatim Report of Proceedings (VRP) (Feb. 14, 2017) at 108. A.M. testified it was likely the other juvenile's or the adult woman's backpack and not hers. *Id.* at 107-08. The trial court rejected A.M.'s unwitting

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

possession defense and convicted her of both counts. She was sentenced to two days of custody with credit for time served and no probation.

A.M. appealed her possession of a controlled substance conviction. A.M. raised for the first time on appeal that the admission of the inventory form was a violation of her right against self-incrimination, and she also argued that the unwitting possession defense was a violation of due process. The Court of Appeals declined to review her Fifth Amendment claim, holding that even if there was error, it caused no prejudice to her case and, as such, she does not meet the requirements for RAP 2.5(a)(3). *See State v. A.M.*, No. 76758-5-I, (Wash. Ct. App. July 30, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/767585.pdf. The court also rejected her due process argument.

A.M. petitioned for review in this court on her due process claim and Fifth Amendment claim. We granted review.

## ANALYSIS

### The asserted error is reviewable under RAP 2.5

A.M. argues that admitting the detention center inventory form violates her right against self-incrimination. Trial counsel objected to the evidence on relevancy grounds, and the exhibit was admitted. The Court of Appeals declined to review the issue because it held that A.M. failed to meet the requirements of RAP 2.5(a)(3) when she failed to show actual prejudice.

Ordinarily, we do not consider unpreserved errors raised for the first time on review. *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988). However, manifest

4

errors affecting a constitutional right may be raised for the first time on appeal. RAP 2.5(a)(3); *In re Dependency of M.S.R.*, 174 Wn.2d 1, 11, 271 P.3d 234 (2012). To determine whether manifest constitutional error was committed there must be a "'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (alteration in original) (internal quotation marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).

RAP 2.5(a)(3) serves as a "gatekeeping function." *State v. Lamar*, 180 Wn.2d 576, 583, 327 P.3d 46 (2014). The purpose of the rule is different from actually reviewing the claimed error. *Id.* "The requirements under RAP 2.5(a)(3) should not be confused with the requirements for establishing an actual violation of a constitutional right or for establishing lack of prejudice under a harmless error analysis if a violation of a constitutional right has occurred." *Id.*

Here, the Court of Appeals held that because the alleged error caused no prejudice, it would not review the claim. However, RAP 2.5(a)(3) requires only that the defendant make a plausible showing that the error resulted in actual prejudice, meaning there were practical and identifiable consequences at trial. *See id.*

It is well settled that article I, section 9 of the Washington State Constitution and the Fifth Amendment to the United States Constitution afford a defendant the right against self-incrimination. When placing suspects in custody, police must advise them of their right to remain silent and their right to an attorney before interrogation. *See Miranda*, 384 U.S. at 445. Absent a valid waiver, statements obtained from an individual in custody are

presumed to be involuntary and violate the Fifth Amendment. *State v. Sargent*, 111 Wn.2d 641, 648, 762 P.2d 1127 (1988). A person is "in custody" when her freedom of movement is restricted. *Oregon v. Mathiason*, 429 U.S. 492, 494-95, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). An "interrogation" is "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (footnote omitted).

When a defendant is placed in custody and has invoked her *Miranda* rights, any words or actions on the part of the police that are reasonably likely to elicit an incriminating response violate the Fifth Amendment. Although certain standard intake procedures may be required, we have held that using those procedures against a defendant's will violates the Fifth Amendment. *See State v. Juarez DeLeon*, 185 Wn.2d 478, 487, 374 P.3d 95 (2016). For example, in *DeLeon*, the defendants were asked to fill out a gang affiliation form as part of the jail's booking process. *Id.* at 484. At their trial, the judge admitted the defendants' statements on the form over the objection of defense counsel. *Id.* We held that while the questions were meant for the purpose of protecting inmates from "real and immediate threats of violence," the defendants' Fifth Amendment rights were violated by presenting those statements as evidence. *Id.* at 488-89.

A.M. meets the first part of RAP 2.5(a)(3) because the asserted error clearly implicates her Fifth Amendment right. Moreover, A.M. makes a plausible showing that the error had practical and identifiable consequences at trial because the trial court admitted the evidence over the objection of counsel, albeit on different grounds. The

error is manifest from the record. We thus proceed to the merits of the raised constitutional error.

It was error to admit the inventory form

When A.M. was arrested by police, she invoked her *Miranda* rights.[2] She was unquestionably in custody when she was arrested at Goodwill and transported to the juvenile detention center. Thus, any words or actions on the part of the police that were reasonably likely to elicit an incriminating response violate the Fifth Amendment. A.M. was required to sign an inventory form listing the backpack, which held the methamphetamine.[3] Above the signature lines were two statements: "I have read the above accounting of *my property* and money and find it to be accurate. I realize that property not claimed within 30 days will be subject to disposal" and "I have received the above listed property." Ex. Transmittal Certificate, Ex. 3 (emphasis added).

While a standard intake form itself does not necessarily violate a defendant's Fifth Amendment rights, the signed statement on the intake form violated A.M.'s right against self-incrimination. She was clearly in custody, and signing the intake form was involuntary. At trial, the juvenile center supervisor testified that the juvenile signs the intake form after reviewing it with staff. VRP at 89 (Feb. 14, 2017). Any refusal to sign the form or disagreement with the inventory list by the juvenile would be noted on the

---

[2] It is unclear exactly when she invoked her *Miranda* rights because defense counsel filed a motion in limine to prevent any mention of A.M.'s invocation of her right, but it was sometime after she was arrested but prior to her being booked at the detention center. *See* CP at 51-52; VRP (Feb. 14, 2017) at 10-11, 60-61.

[3] At trial, the detention center supervisor noted that the center's goal is to ensure people leave with the items they came in with for "liability" purposes. VRP (Feb. 14, 2017) at 102-03.

sheet. *Id.* at 96. Requiring a juvenile to sign a form with that statement would be reasonably likely to elicit an incriminating response from the suspect.

<u>The manifest constitutional error was not harmless</u>

Next, we consider whether the manifest error was harmless. A constitutional error is harmless if "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002) (internal quotation marks omitted) (quoting *Neder v. United States*, 527 U.S. 1, 15, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)). "An error is not harmless beyond a reasonable doubt where there is a reasonable probability that the outcome of the trial would have been different had the error not occurred." *State v. Powell*, 126 Wn.2d 244, 267, 893 P.2d 615 (1995) (citing *State v. Benn*, 120 Wn.2d 631, 649, 845 P.2d 289 (1993)). "A reasonable probability exists when confidence in the outcome of the trial is undermined." *Id.*

During closing arguments, when addressing the unwitting possession defense, the prosecutor stated, "We know that she signed for the backpack, indicated it was her property when she was booked in. We know that she signed for it again when she was released, even though today she has testified that it wasn't her backpack." VRP at 118-19. In essence, the prosecutor directly addressed and contradicted A.M.'s unwitting possession defense by relying on the inventory form to support the conviction. Without the admission of the intake form, the prosecutor would not have been able to use A.M.'s statements in the form to refute her unwitting possession defense.

The State bears the burden of proving that the constitutional error was harmless. *DeLeon*, 185 Wn.2d at 488. Here, the State argues there is overwhelming evidence that "the property slip played no part in A.M.'s conviction." Suppl. Br. of Resp't at 5. The State points to the trial court's oral findings and lack of reliance on the property sheet, as well as the findings of fact as "verities on appeal." *Id*. at 4-5.

At the conclusion of trial, the court stated:

> Quite frankly, whether she removed the backpack or whether the backpack went with her from detention really was not a big factor in my case. It was only—it was that she was the only one that was possessing the backpack, and I don't find that there was unwitting possession in this matter.

VRP (Feb. 22, 2017) at 134. While the trial judge noted it was "a close case," she "looked at a number of . . . things" and found that "the respondent was the only person that was putting items in the backpack, [and] she was the one that walked out with the backpack." *Id*. at 133-34. Thus, the State argues that their burden to prove beyond a reasonable doubt A.M. would have still been convicted is satisfied.

But A.M. need prove only by a preponderance of the evidence the affirmative defense of unwitting possession. *See State v. Deer*, 175 Wn.2d 725, 735, 287 P.3d 539 (2012) (noting the affirmative defense "'ameliorates the harshness of a strict liability crime.'" (quoting *State v. Bradshaw*, 152 Wn.2d 528, 538, 98 P.3d 1190 (2004))). A.M. testified that the backpack was not hers and that she believed it belonged to one of the other two women who were with her "[b]ecause it came from their house" and she "[saw the two women] bring it out of their house." VRP (Feb. 14, 2017) at 108. The State relied on her property form to counter that testimony.

9

Further, A.M. testified that she never looked into the outer pocket of the backpack where the methamphetamine was found, and the evidence showed only that A.M. put the costumes into the main pouch of the backpack. *Id.* She also testified that even though the backpack was not her property, she took it from the detention center only because "it belonged to my best friend and her family at the time." *Id.* at 110. When A.M. returned the backpack to her friend, she confronted her friend, asking why the methamphetamine was in the backpack. *Id.* A.M. testified that she never knew methamphetamine was in the bag and that she had never seen the pill bottle or the little baggies before. *Id.* at 111. In sum, A.M. testified that the adult female put the children's costumes into the cart and that A.M. placed the costumes into the large pocket of the backpack. *Id.* at 107-09. The costumes were children's costumes, and A.M. had no children. *See id.* at 107 (indicating the costumes were for the adult woman's children). No witness saw A.M. look into the small side pocket where the drugs were found. The only testimony about ownership of the backpack came from A.M., who said that it came from the adult female's home and that A.M. did not own the backpack. A.M. also testified that the adult female was "under the influence." *Id.* at 109.

At the conclusion of trial, the judge said she did not believe A.M. "perjur[ed] herself]." VRP (Apr. 11, 2017) at 157. But the only evidence in the record that reasonably contradicts unwitting possession of the methamphetamine is the admitted inventory form signed by A.M. that indicates the backpack as her property. The prosecutor referenced the fact that A.M. signed for the backpack as her own on at least two different occasions in the record. *See* VRP (Feb. 14, 2017) at 118-19; VRP (Apr. 11,

2017) at 149. Even though the trial court said the inventory form was "not a big factor," it did consider that evidence in making its decision. VRP (Feb. 22, 2017) at 134. Based on a review of the entire record, it is difficult to say beyond a reasonable doubt, the trier would reach the same conclusion absent the manifest constitutional error.

We hold the admission of the inventory form was manifest constitutional error in violation of A.M.'s right against self-incrimination. As such, we reverse the lower court's decision that the admission of the inventory form was proper.

Because we find there was reversible error here, we find delving into A.M.'s due process argument is unnecessary and decline to address it.

## CONCLUSION

Admission of the inventory form with the compelled statement was manifest constitutional error in violation of A.M.'s right against self-incrimination. Because it is unclear whether the State proved beyond a reasonable doubt absent the unconstitutional evidence that A.M. committed the crime of possession of a controlled substance, we reverse the Court of Appeals and remand the case back to the trial court for further proceedings.

_Madsen, J._

WE CONCUR:

_Fairhurst, C.J._

_Wiggins, J._

_Johnson_

_Owens, J._

_Stephens, J._

_Yu, J_

No. 96354-1

GORDON McCLOUD, J. (concurring)—I agree with the majority that A.M.

asserts a manifest constitutional error subject to review under RAP 2.5. I further

agree that the asserted error—admission of the signed intake form—violated

A.M.'s article I, section 9 and Fifth Amendment rights against self-incrimination.

WASH. CONST. art. I, § 9; U.S. CONST. amend. V. And I agree that on this record,

those errors were not harmless. I therefore join the majority's analysis of that issue

in full.

I write separately because I believe that we must reach the pressing issue

that the majority declines to address: the ongoing criminalization of innocent

conduct in Washington's war on drugs, as permitted by two of this court's

decisions. *See* RAP 13.4(b)(3), (4). In *State v. Cleppe*, 96 Wn.2d 373, 635 P.2d

435 (1981), and *State v. Bradshaw*, 152 Wn.2d 528, 98 P.3d 1190 (2004), this

court held that the legislature intended basic drug possession, RCW 69.50.4013,[1] to

---

[1] RCW 69.50.401(d) was the statute interpreted in *Cleppe*. 96 Wn.2d at 375.
RCW 69.50.4013 is that statute recodified. *See* LAWS OF 2003, ch. 53, §§ 331, 334.

be a strict liability felony. As a result, the State never needs to prove that a defendant knowingly possessed drugs when it prosecutes basic drug possession cases. And without having proved knowing possession, the State may seek—and a court may impose—a sentence of up to five years' imprisonment and a $10,000 fine. RCW 69.50.4013(2); RCW 9A.20.021(1)(c). Along with those sanctions come the social stigma of felony drug possession and its attendant collateral consequences.

Though grievously wrong, *Cleppe* and *Bradshaw* are now settled law, and I am obliged to follow the statutory interpretation that they provide. A statute's settled interpretation does not, however, insulate the statute from a test of its constitutional validity. I would hold that the settled interpretation of Washington's basic drug possession statute offends due process insofar as it permits heavy criminal sanctions for completely innocent conduct. RCW 69.50.4013. This is especially true where, as here, the defendant is a juvenile.

ANALYSIS

I.   Our Settled Law Provides That Washington's Basic Drug Possession
     Statute Contains No Mens Rea Element of Any Kind

In *Cleppe* and *Bradshaw*, this court held that a defendant may be convicted of possession of a controlled substance—Washington's low-level drug possession offense—even if the defendant was unaware that they possessed drugs. This

2

holding extended to both knowledge of possession itself and knowledge that the substance possessed was, in fact, a drug. Accordingly, all that is required for conviction is the fact of possession, knowing or unknowing.

*Cleppe* and *Bradshaw* dramatically departed from statute, common law, and traditional methods of interpretation, and they were incorrect when they were decided. But having been on the books so long, without legislative revision, they are now the law of the land. Our doctrine of legislative acquiescence compels that conclusion.

A. Courts Always Read a Mens Rea Element into a Criminal Statute—Unless the Legislature Expressly States Its Intent To Create a Strict Liability Crime

American courts have long recognized that guilt requires a criminal mindset, or mens rea. This "contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Morissette v. United States*, 342 U.S. 246, 250, 72 S. Ct. 240, 96 L. Ed. 2d 288 (1952). A criminal offense is "generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand." *Id.* at 251. This understanding "took deep and early root in American soil." *Id.* at 252.

3

Because "'[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence,'" *Staples v. United States*, 511 U.S. 600, 605, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994) (alteration in original) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978)), courts apply "a longstanding presumption, traceable to the common law," that every statutory offense contains a mens rea element, *Rehaif v. United States*, __ U.S. __, 139 S. Ct. 2191, 2195, 204 L. Ed. 2d 594 (2019) (citing *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994); *Morissette*, 342 U.S. at 256-58). "We apply the presumption in favor of scienter even when Congress does not specify any scienter in the statutory text." *Rehaif*, 139 S. Ct. at 2195 (citing *Staples*, 511 U.S. at 606) (possessing firearms); *see also Elonis v. United States*, __ U.S. __, 135 S. Ct. 2001, 2009-11, 192 L. Ed. 2d 1 (2015) (making threats); *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 522, 114 S. Ct. 1747, 128 L. Ed. 2d 539 (1994) (selling drug paraphernalia); *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 559-60, 91 S. Ct. 1697, 29 L. Ed. 2d 178 (1971) (shipping hazardous materials); *Morissette*, 342 U.S. at 263-64 (converting federal property to one's own use); *State v. Anderson*, 141 Wn.2d 357, 366, 5 P.3d 1247 (2000) (possessing firearms); *State v. Martin*, 73 Wn.2d 616, 624-25, 440 P.2d 429

4

(1968) (leaving the scene of a vehicle collision). This presumption in favor of

mens rea becomes stronger as the offense's penalties become harsher. *Rehaif,* 139

S. Ct. at 2197; *Anderson,* 141 Wn.2d at 364. The common law's demand for a

mens rea is even strong enough to displace a statute's "most natural grammatical

reading." *X-Citement Video,* 513 U.S. at 68-69.[2]

Of course, this is not just the common law; it is common sense. Strict

liability offenses have the potential to criminalize innocent conduct. To avoid that

unjust result, legal thinkers across the ideological spectrum support the

presumption in favor of mens rea. *See* John G. Malcolm, *Morally Innocent,*

*Legally Guilty: The Case for Mens Rea Reform,* 18 FEDERALIST SOC'Y REV. 40

(2017); Br. of Nat'l Ass'n of Criminal Defense Lawyers as Amicus Curiae in

Supp. of Pet'r, *Rehaif,* 139 S. Ct. at 2195 (No. 17-9560).[3] And "[t]he cases in

---

[2] The presumption, of course, is just a presumption. The legislature may rebut the presumption with an express statement that makes its intent to create a strict liability offense clear. For example, the legislature could state that "'[t]his section shall not be construed to require the [State] to prove a state of mind with respect to any element of the offense defined in this section.'" John G. Malcolm, *Morally Innocent, Legally Guilty: The Case for Mens Rea Reform,* 18 FEDERALIST SOC'Y REV. 40, 45 (2017) [https://perma.cc/N37B-FUCP].

[3] A bipartisan group of federal lawmakers has even pushed to codify the United States Supreme Court's practice of reading mens rea into silent or ambiguous criminal statutes. *See* Matt Ford, *Could a Controversial Bill Sink Criminal-Justice Reform in Congress?,* THE ATLANTIC (Oct. 26, 2017), https://www.theatlantic.com/politics/archive/2017/10/will-congress-reform-criminal-intent/544014/; John Villasenor, *Over-criminalization and Mens Rea Reform: A Primer,*

which [the United States Supreme Court has] emphasized scienter's importance in separating wrongful from innocent acts are legion." *Rehaif*, 139 S. Ct. at 2196-97 (citing cases).

    B.    Our State Legislature Reinforced That Rule by Directing Washington Courts To Interpret Washington Penal Statutes against the Backdrop of the Common Law

In Washington, courts must "supplement all penal statutes of this state" with "[t]he provisions of the common law relating to the commission of crime and the punishment thereof" "insofar as not inconsistent with the Constitution and statutes of this state." RCW 9A.04.060. We have held that compliance with this directive permits the courts to rely on the common law to determine the elements of crimes. *See State v. Chavez*, 163 Wn.2d 262, 273-74, 180 P.3d 1250 (2008). Indeed, "the judiciary would be acting contrary to the legislature's legitimate, express expectations, as well as failing to fulfill judicial duties, if the courts did not employ long-standing common law definitions to fill in legislative blanks in statutory crimes." *State v. David*, 134 Wn. App. 470, 481, 141 P.3d 646 (2006).

Washington courts must therefore follow the long-standing common law practice of reading mens rea into criminal offenses, absent express legislative

BROOKINGS INSTITUTION (Dec. 22, 2015), https://www.brookings.edu/blog/fixgov/2015/12/22/over-criminalization-and-mens-rea-reform-a-primer/ [https://perma.cc/Z88L-ETGU].

intent to the contrary. Doing so is "not inconsistent with the Constitution and statutes of this state." RCW 9A.04.060. Rather, as the United States Supreme Court has indicated, following that rule avoids a confrontation with the constitution. *Staples*, 511 U.S. at 616-19; *Smith v. California*, 361 U.S. 147, 150, 80 S. Ct. 215, 4 L. Ed. 2d 205 (1959) (citing *Lambert v. California*, 355 U.S. 225, 78 S. Ct. 240, 2 L. Ed. 2d 228 (1957)).

> C. *Cleppe* and *Bradshaw* Did Not Follow the Common Law Rule That We Always Interpret a Mens Rea Element into a Criminal Statute

*Cleppe* and *Bradshaw* departed from the common law rule and, with it, from legislative intent.

> 1. The Drug Possession Statute Is Silent on Mens Rea

RCW 69.50.4013(1), the basic drug possession statute, states, "It is unlawful for any person to possess a controlled substance . . . ." The statute makes no mention of the mindset that must accompany the possession. *Cf.* RCW 9A.08.010 (defining "intent," "knowledge," "recklessness," and "criminal negligence"). But neither does the statute expressly provide that the State need not prove a state of mind. *Cf. supra* p. 5 n.2. Thus, applying the common law's presumption in favor of mens rea, as the legislature has directed, the statute should be read to require some showing of a guilty mind.

Such a reading is consistent with the statute's context. *See Dep't of Ecology v. Campbell & Gwinn LLC*, 146 Wn.2d 1, 11-12, 43 P.3d 4 (2002) (holding that a statute's context bears on its plain meaning). In *State v. Boyer*, this court interpreted another drug statute within the same chapter of the revised code. 91 Wn.2d 342, 588 P.2d 1151 (1979). That statute made it "'unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance.'" *Id.* at 344 (quoting RCW 69.50.401(a)). We held that the statute's partial silence required us to construe mens rea as part of the offense. We said:

> The issue is whether guilty knowledge, an understanding of the identity of the product being delivered, is a part of the crime. The intent language in the statute does not appear to resolve this issue since that language, rather, addresses a different question, whether or not there is an "intent to manufacture or deliver." The language of the statute thus provides no guidance on the issue before us. However, without the mental element of knowledge, even a postal carrier would be guilty of the crime were he innocently to deliver a package which in fact contained a forbidden narcotic. Such a result is not intended by the legislature. Accordingly, absent express legislative language to the contrary, we find in the context of this statute, its history and language, that guilty knowledge is intrinsic to the definition of the crime itself. Guilty knowledge must be proven beyond a reasonable doubt in conviction of this defendant under the statute.

*Id.* Accordingly, if a defendant truly believes that the cocaine he handed to his neighbor was baking powder, he has not committed the offense and cannot be convicted. The basic drug possession statute should be read the same way. *See*

8

*Morissette*, 342 U.S. at 269 (doubting the likelihood of "one crime without intent [being] smuggled into a section whose dominant offenses do require intent").

> 2. *Cleppe* Did Not Apply the Rule of Statutory Interpretation Requiring the Court To Read a Mens Rea Element into the Drug Possession Statute

But *Cleppe* did not follow *Boyer*, the common law presumption in favor of mens rea, or the legislature's directive to apply the common law. Rather, faced with the basic drug possession statute's silence on mens rea, the *Cleppe* court looked to legislative history. 96 Wn.2d at 378-80. And that legislative history drove the court's conclusion that "the legislative intent is clear"—mens rea is not an element of the offense of basic drug possession, despite the offense being a felony crime. *Id.* at 380. For all the reasons described above, that interpretation was at odds with legislative intent and the court's usual methods of statutory interpretation.

In reviewing the statute's legislative history, the court notably departed from the accepted methods of statutory interpretation in another way as well: it failed to apply the rule of lenity. The rule of lenity requires that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *United States v. Bass*, 404 U.S. 336, 347, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971) (quoting *Rewis v. United States*, 401 U.S. 808, 812, 91 S. Ct. 1056, 28 L. Ed. 2d 493 (1971)). "This

principle is founded on two policies that have long been part of our tradition. First, 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.'" *Id.* at 348 (quoting *McBoyle v. United States*, 283 U.S. 25, 27, 51 S. Ct. 340, 75 L. Ed. 816 (1931)). "Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies 'the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.'" *Id.* (quoting HENRY J. FRIENDLY, BENCHMARKS 209 (1967)). Thus, because we resort to legislative history only when a statute is ambiguous, *Campbell & Gwinn*, 146 Wn.2d at 12, but we resolve ambiguous criminal statutes in favor of the defendant (and against the drafter—the State) under the rule of lenity,[4] we should not rely on legislative history to interpret criminal statutes when the rule of lenity suffices. The *Cleppe* court's decision to do so was error.[5]

---

[4] *State v. Weatherwax*, 188 Wn.2d 139, 153-56, 392 P.3d 1054 (2017); *In re Pers. Restraint of Hopkins*, 137 Wn.2d 897, 901, 976 P.2d 616 (1999).

[5] *Cleppe* also may have inappropriately disregarded another canon of statutory interpretation: avoiding absurd results. *See State v. Vela*, 100 Wn.2d 636, 641, 673 P.2d 185 (1983) (citing *Crown Zellerbach Corp. v. Dep't of Labor & Indus.*, 98 Wn.2d 102,

10

The departure from the usual rules of statutory interpretation is also evident in *Cleppe*'s adoption of an extratextual, judicially constructed, affirmative defense. In conflict with its erroneous conclusion that the legislature intended basic drug possession to be a strict liability felony, the *Cleppe* court created an affirmative defense of unwitting possession out of whole cloth. 96 Wn.2d at 380-81. We justified that creation as a way to "ameliorate[] the harshness" caused by our mistaken view of legislative intent. *Id.* at 381. We reasoned:

> That unwitting possession has been allowed as an affirmative defense in simple possession cases may seem anomalous. If guilty knowledge or intent to possess are not elements of the crime, of what avail is it for the defendant to prove his possession was unwitting? Such a provision ameliorates the harshness of the almost strict criminal liability our law imposes for unauthorized possession of a controlled substance. If the defendant can affirmatively establish his "possession" was unwitting, then he had no possession for which the law will convict. The burden of proof, however, is *on the defendant.*

*Id.* at 380-81. Without citation to authority and contrary to legislative intent, "[t]his [was] judicial legislation in its most direct form." *City of Kennewick v. Day*, 142 Wn.2d 1, 16, 11 P.3d 304 (2000) (Talmadge, J., concurring). Notably, had we followed the appropriate methodology to interpret the statute, and read a

---

653 P.2d 626 (1982); *Whitehead v. Dep't of Soc. & Health Servs.*, 92 Wn.2d 265, 595 P.2d 926 (1979)). As the United States Supreme Court has recognized, it would be "not merely odd, but positively absurd" to conclude that a felony statute criminalizes unwitting conduct. *X-Citement Video*, 513 U.S. at 69.

11

mens rea into that statute from the start, we would never have been in the position of performing this legislative act.

For this multitude of reasons, *Cleppe* was incorrectly decided.

### 3. *Bradshaw* Endorsed *Cleppe*'s Error

We nonetheless reaffirmed *Cleppe* 23 years later when we decided *Bradshaw*. We again looked to legislative history to guide our decision. *Bradshaw*, 152 Wn.2d at 532-33, 537. And we again endorsed our judicially constructed affirmative defense because it "ameliorates the harshness of a strict liability crime." *Id.* at 538 (citing *Cleppe*, 96 Wn.2d at 380-81). We rejected the notion that "legislative direction to dispense with criminal intent must be crystal clear." *Id.* at 540 (Sanders, J., dissenting).

We also stood by *Cleppe* in the face of two new arguments. We held that "possession" is not a term of art that incorporates knowledge. *Id.* at 538 (declining to follow *State v. Hornaday*, 105 Wn.2d 120, 125, 713 P.2d 71 (1986), which held that "possession" "clear[ly], plain[ly] and unambiguous[ly]" requires knowledge of the substance being possessed). And we held that the fact that Washington was one of only two states to allow convictions for basic drug possession without proof of knowledge did not require rethinking *Cleppe*. *Id.* at 534-35. We reached that conclusion in spite of the fact that the legislature modeled its drug statutes on a

12

uniform act and directed us to interpret the statutes "'to effectuate [the] general purpose to make uniform the law.'" *Id.* (quoting RCW 69.50.603).

Finally, we repeatedly suggested that the legislature had acquiesced in our holding in *Cleppe*. *Id.* at 533, 535, 537, 539. We noted that "[s]ince *Cleppe*, the legislature has amended [the basic drug possession statute] seven times and has not added a mens rea element." *Id.* at 533 (citing session laws). Accordingly, we upheld *Cleppe*'s erroneous interpretation.

> D. The Legislature Has Acquiesced in *Cleppe*'s and *Bradshaw*'s Interpretation of the Drug Possession Statute

This court follows the rule that the legislature's failure to amend a statute after we interpret it shows that the legislature agrees with our interpretation. As Judge Korsmo has explained:

> The purpose of statutory construction is to give effect to the meaning of legislation. Once a court has construed a statute, the legislative branch is free to clarify its intent by altering the statute if it sees fit. If it does not do so, then we presume the legislature is satisfied with the interpretation. At some point, legislative acquiescence in the interpretation is assumed. When that point is reached, courts essentially lose the ability to change their mind about what the statute means.

*City of Federal Way v. Koenig*, 167 Wn.2d 341, 352, 217 P.3d 1172 (2009) (Korsmo, J. Pro Tem., concurring) (footnote and citations omitted). At that point,

13

"[t]he legislative process . . . becomes the sole method of changing the statute's interpretation." *Id.*

In *Buchanan v. International Brotherhood of Teamsters*, for example, we adhered to a long-standing interpretation of a statute, despite many reasons to doubt its correctness. 94 Wn.2d 508, 617 P.2d 1004 (1980). We began by expressing concern that we had employed an improper methodology when we first interpreted the statute. *Id.* at 511; *see also id.* at 514 (Rosellini, J., concurring) (noting that the interpretation rendered in the previous case was "perhaps not adhering to the exact letter of the enactment"). We also recognized that the United States Supreme Court subsequently reached "[a]n opposite result . . . construing an identical federal statute." *Id.* at 509-10 (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)). We nonetheless declined to revisit our established interpretation. Because 22 legislative sessions had come and gone over 17 years without the legislature amending the statute, we held that "it was and is the policy of the legislature to concur in" the established rule. *Id.* at 511.

If the passage of time and legislative amendments are the sole considerations, the case for acquiescence is even stronger here. Thirty-eight years have passed since this court decided *Cleppe*. *Bradshaw* reaffirmed *Cleppe*, and 15

14

years have passed since we decided *Bradshaw*. Additionally, the legislature, or the

people acting through the initiative, have amended the basic drug possession

statute 11 times since *Cleppe*.[6] Many of the most recent amendments have

deescalated Washington's war on drugs. *E.g.*, LAWS OF 2013, ch. 3 (Initiative

502). But neither the people nor the legislature have corrected our error and

clarified that mens rea is an element that the State must prove in basic drug

possession prosecutions. Against the backdrop of those amendments and over that

long period of time, the legislature's and the people's continuing inaction on

*Cleppe* and *Bradshaw* is considered silent assent under our case law. *See 1000*

*Friends of Wash. v. McFarland*, 159 Wn.2d 165, 181-82, 149 P.3d 616 (2006)

(plurality opinion); *id.* at 190 (Madsen, J., concurring).

The case for acquiescence takes on even greater strength in light of the

number of basic drug possession cases that move through Washington courts and,

correspondingly, the number of times we have relied on *Cleppe* and *Bradshaw* in

other cases. *See, e.g., Day*, 142 Wn.2d at 10-11; *State v. Staley*, 123 Wn.2d 794,

799, 872 P.2d 502 (1994); *see also State v. Schmeling*, 191 Wn. App. 795, 801,

---

[6] *See* LAWS OF 2017, ch. 317, § 15; LAWS OF 2015 2d Spec. Sess., ch. 4, § 503; LAWS OF 2015, ch. 70, § 14; LAWS OF 2013, ch. 3, § 20 (Initiative 502); LAWS OF 2003, ch. 53, §§ 331, 334; LAWS OF 1998, ch. 290, § 1; LAWS OF 1998, ch. 82, § 2; LAWS OF 1997, ch. 71, § 2; LAWS OF 1996, ch. 205, § 2; LAWS OF 1989, ch. 271, § 104; LAWS OF 1987; ch. 458, § 4.

365 P.3d 202 (2015); *State v. Sanders*, 66 Wn. App. 380, 389-90, 832 P.2d 1326

(1992); *State v. Adame*, 56 Wn. App. 803, 806-09, 785 P.2d 1144 (1990); *State v.*

*Knapp*, 54 Wn. App. 314, 773 P.2d 134 (1989). So the legislature's and the

people's silence cannot be attributed to the obscurity of our decisions. *Cleppe* and

*Bradshaw* struck at the heart of our criminal law and social policies. The

legislative silence is thus all the more deafening. *Accord Koenig*, 167 Wn.2d at

353-54 (Korsmo, J. Pro Tem., concurring).

Still, there are at least two qualifications to this conclusion. First, it is

debatable whether a finding of legislative acquiescence is constitutionally

permissible when the text of a criminal statute cannot support the court's long-

standing interpretation using ordinary principles of statutory interpretation. Rather,

due process might require reinterpretation of the statute because "fair warning

concerning conduct rendered illegal" is foundational to our justice system.

*Liparota v. United States*, 471 U.S. 419, 427, 105 S. Ct. 2084, 85 L. Ed. 2d 434

(1985) (citing *Bass*, 404 U.S. at 348). The United States Supreme Court has

avoided this question by correctly holding that a silent statute unambiguously

includes a mens rea element. *See Staples*, 511 U.S. at 619 n.17; *Liparota*, 471 U.S.

at 427 (citing cases).

16

Second, assuming that legislative acquiescence is constitutionally permissible in this situation, it is unclear whether acquiescence in *Cleppe* and *Bradshaw*, cases involving adult offenders, extends to cases involving juveniles. The reason is that the legislature sometimes treats juveniles as the victims in drug crimes, not the perpetrators. For example, RCW 69.50.406 makes it a felony for an adult to distribute drugs to a juvenile. Each distribution to each juvenile is a separate crime because each juvenile is a victim of this offense. *State v. Vanoli*, 86 Wn. App. 643, 651-52, 937 P.2d 1166 (1997). Another statute, RCW 69.50.435(1)(a)-(d), enhances penalties for committing certain drug offenses in a school, on a school bus, or within 1,000 feet of a school or school bus stop. We have held that such penalties further the State's "legitimate goal of keeping drug dealers away from schoolchildren," who are vulnerable potential victims. *State v. Leyve Coria*, 120 Wn.2d 156, 172, 839 P.2d 890 (1992). "[I]t is the children in the areas who are being shielded from the harmful effects of drug crimes." *Id.* at 173.

In light of this, it is important to remember that "the United States Supreme Court, federal courts, and Washington courts have held that when the legislature enacts a statute designed for the protection of one class—here, children . . .—it shows the legislature's intent to protect members of that class from criminal liability" when they are the victims of the very behavior that the legislature sought

17

to punish. *State v. Gray*, 189 Wn.2d 334, 349, 402 P.3d 254 (2017) (Gordon

McCloud, J., dissenting) (citing *Gebardi v. United States*, 287 U.S. 112, 119, 53 S.

Ct. 35, 77 L. Ed. 206 (1932); *City of Auburn v. Hedlund*, 165 Wn.2d 645, 652, 201

P.3d 315 (2009)).

Here, A.M. testified that she was a victim. She stated that the blue backpack

containing the methamphetamine did not belong to her; it came from the home of

her friend and her friend's mother. Verbatim Report of Proceedings (VRP) (Feb.

14, 2017) at 108. A.M. further testified that she returned the blue backpack to the

friend's family after she was released from juvenile detention. *Id.* at 110. The

court did not discredit A.M.'s testimony. VRP (Apr. 11, 2017) at 152, 157-58.

Instead, it stated that it did not think that A.M. was a liar or that she had committed

perjury. *Id.* Her testimony alone was just not sufficient in the court's view to

carry her burden of proving the unwitting possession defense. *Id.*

*Gebardi*'s rule of interpretation provides that the legislature intended A.M.,

a victim, to be immune from prosecution for the receipt and possession of that

methamphetamine. *Cleppe* and *Bradshaw* do not suggest otherwise. So it is

possible that the legislature both acquiesced in basic drug possession being a strict

liability offense *and* intended that juvenile victims not be subject to its

ensnarement. Stated differently, it is doubtful that the legislature can presume both

that the child is a victim in the situation where an adult provides her with drugs *and* that the child is a fully informed actor, wary of being taken advantage of in this manner.

Given our case law, however, I proceed on the assumption that the legislature acquiesced in *Cleppe*'s and *Bradshaw*'s interpretation of RCW 69.50.4013, that the acquiescence to that interpretation extends to situations such as this one where a juvenile has been victimized, and that the theory of legislative acquiescence is constitutionally permissible.[7]

---

[7] There is arguably a third reason that justifies revisiting *Cleppe* and *Bradshaw* in spite of the legislature's silence: Washington now appears to be the only state that does not require the State to prove knowing possession beyond a reasonable doubt. As noted, Washington, along with North Dakota, was one of only two jurisdictions that did not read a mens rea element into basic drug possession when we decided *Bradshaw* in 2004. 152 Wn.2d at 534. But North Dakota has since amended its law. *See* N.D. CENT. CODE §§ 19-03.1-23(7)(a), 12.1-02-02(1)(e) (requiring North Dakota prosecutors to prove willful possession). Thus, it appears to be fully within our capacity "to make uniform the law," as the legislature has directed, RCW 69.50.603, by overruling *Cleppe* and *Bradshaw*.

While adhering to that legislative mandate is certainly important, I do not consider North Dakota's change of law a sufficient reason to revisit *Cleppe* and *Bradshaw*. *Bradshaw* took into account Washington's outlier status. 152 Wn.2d at 534-35. Becoming the only state, instead of one of only two states, does little to strike at *Bradshaw*'s legal underpinnings. *See W.G. Clark Constr. Co. v. Pac. N.W. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014) (noting that the court may reconsider prior decisions "when the legal underpinnings of our precedent have changed or disappeared altogether" (citing cases)).

II. The Strict Liability Drug Possession Statute Is Not an
  Unconstitutional Burden-Shifting Scheme

The effect of the legislature's acquiescence is that the State need only prove

the fact of possession beyond a reasonable doubt. The defendant, however, may

raise the affirmative defense of unwitting possession, which the defendant must

prove by a preponderance of the evidence. A.M. challenges this arrangement on

the basis that it shifts the burden of disproving knowledge to her, thereby violating

her Fourteenth Amendment right to due process. U.S. CONST. amend. XIV. Her

challenge fails because it rests on the incorrect premise that knowledge is an

element of the offense.

"The State is foreclosed from shifting the burden of proof to the defendant

only 'when an affirmative defense *does* negate an element of the crime.'" *Smith v.*

*United States*, 568 U.S. 106, 110, 133 S. Ct. 714, 184 L. Ed. 2d 570 (2013)

(quoting *Martin v. Ohio*, 480 U.S. 228, 237, 107 S. Ct. 1098, 94 L. Ed. 2d 267

(1987) (Powell, J., dissenting)). "Where instead it 'excuse[s] conduct that would

otherwise be punishable,' but 'does not controvert any of the elements of the

offense itself,' the Government has no constitutional duty to overcome the defense

beyond a reasonable doubt." *Id.* (alteration in original) (quoting *Dixon v. United*

*States*, 548 U.S. 1, 6, 126 S. Ct. 2437, 165 L. Ed. 2d 299 (2006)). In *State v. W.R.*,

this court applied those principles and held that in rape prosecutions, the State must

20

prove lack of consent beyond a reasonable doubt because consent negates rape's

"forcible compulsion" element. 181 Wn.2d 757, 766-67, 336 P.3d 1134 (2014).

Assuming that the legislature has acquiesced in *Cleppe*'s and *Bradshaw*'s

interpretation of the basic drug possession statute, the offense has a single element:

possession. Unwitting possession does not negate that element; rather, possession

readily "coexist[s]" with unwitting possession. *W.R.*, 181 Wn.2d at 765.

Accordingly, unwitting possession is not an affirmative defense that

unconstitutionally shifts the burden of proof when possession is the only element

of the offense.

III.   The Strict Liability Drug Possession Statute Exceeds the Legislature's
       Authority and Offends the Fourteenth Amendment Right to Due
       Process

The question remains, however, whether the legislature acted within its

power when it made basic drug possession a strict liability felony. To be sure, the

legislature may create strict liability offenses. However, there is a limit to the

legislature's power to criminalize innocent conduct. Given that Washington's

basic drug possession statute not only sweeps in a wide range of innocent conduct

but also authorizes a felony conviction punishable by up to five years in prison and

a $10,000 fine, I would hold that creation of this strict liability offense, with these

21

consequences, and without a public welfare rationale, exceeds the legislature's power.

A.    The Legislature May Create Strict Liability Offenses—within Limits

The United States Supreme Court has repeatedly acknowledged that the legislative branch has authority to enact strict liability crimes. Although such crimes are "disfavored," *Staples*, 511 U.S. at 606 (citing *Liparota*, 471 U.S. at 426), especially as the prescribed punishment ratchets up, *id.* at 618, they are not wholly prohibited. *See, e.g., United States v. Dotterweich*, 320 U.S. 277, 284-85, 64 S. Ct. 134, 88 L. Ed. 48 (1943); *United States v. Balint*, 258 U.S. 250, 254, 42 S. Ct. 301, 66 L. Ed. 604 (1922). And we too have said that "[t]he Legislature may create strict liability crimes," *Anderson*, 141 Wn.2d at 361 (citing *State v. Rivas*, 126 Wn.2d 443, 452, 896 P.2d 57 (1995)), even though they are "generally disfavored," *id.* at 363 (citing *State v. Bash*, 130 Wn.2d 594, 606, 925 P.2d 978 (1996) (plurality opinion)).

But as the United States Supreme Court held in *Lambert* and *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972), the Fourteenth Amendment places limits on this power. In *Lambert*, a Los Angeles ordinance made it a crime for felons "to be or remain in Los Angeles for a period of more than five days without registering" with the city. 355 U.S. at 226. "No

22

element of willfulness [was] by terms included in the ordinance nor read into it by the California court as a condition necessary for a conviction." *Id.* at 227. Although ignorance of the law does not generally excuse a person's conduct, *Int'l Minerals*, 402 U.S. at 563, the United States Supreme Court held that the petitioner's conviction violated her Fourteenth Amendment right to due process because living in Los Angeles was purely passive and in no way blameworthy: "Violation of [the ordinance's] provisions is unaccompanied by any activity whatever, mere presence in the city being the test," *Lambert*, 355 U.S. at 229.

Later, in *Papachristou*, the United States Supreme Court held that the Fourteenth Amendment prohibited a vagrancy ordinance that "makes criminal activities which by modern standards are normally innocent." 405 U.S. at 163. For example, the ordinance outlawed habitual "nightwalking." *Id.* But the United States Supreme Court rejected that broad assertion of legislative authority over such innocent conduct. *Id.* at 171. Innocent insomniacs "often walk at night, perhaps hopeful that sleep-inducing relaxation will result." *Id.* at 163. Such night walks, along with the equally outlawed "'wandering or strolling,'" "are historically part of the amenities of life as we have known them." *Id.* at 164. In the Court's

23

view, legislative fiat was not enough to render innocent conduct guilty, and the ordinance was "plainly unconstitutional."[8] *Id.* at 171.

Likewise, the Louisiana Supreme Court enforced limits on the legislature's power in *State v. Brown*, 389 So. 2d 48, 51 (La. 1980), striking down a statute identical to Washington's. The Louisiana statute "ma[de] it unlawful for any person 'unknowingly . . .' to possess a controlled dangerous substance." 389 So. 2d at 49. The state Supreme Court recognized that "[a]lthough strict liability offenses do exist in the criminal law and do not in all instances offend constitutional requirements, these are limited in number and of a nature different from the statute being challenged here." *Id.* at 50. That statute permitted an individual to unknowingly receive a controlled substance from a third party "and subsequently [be] convicted . . . without ever being aware of the nature of the substance he was given." *Id.* at 51. The court held that such a conviction "does indeed offend the conscious [sic]" and "'unknowing' possession of a dangerous drug cannot be made criminal." *Id.*; *accord People v. Estreich*, 272 A.D. 698, 700-01, 75 N.Y.S.2d 267 (1947) (holding that a statute that criminalizes

---

[8] Although the United States Supreme Court relied on the Fourteenth Amendment's protection against vague criminal statutes to reach its holding in *Papachristou*, and A.M. does not frame her appeal as a vagueness challenge, the premise of *Papachristou*—that there are limits on the State's criminal legislative authority—is nonetheless applicable.

unknowing receipt of stolen property "is without the power of the Legislature" and violates the Fourteenth Amendment).

In contrast to these unconstitutional, scienterless statutes stand constitutionally permissible, scienterless public welfare offenses. Though these strict liability offenses were unknown at common law, the United States Supreme Court accepted them as a necessary response to urbanization, industrialization, and increasingly powerful machinery. *Morissette*, 342 U.S. at 253-54. The offenses therefore most frequently "relat[e] to pure food and drugs, labeling, weights and measures, building, plumbing and electrical codes, fire protection, air and water pollution, sanitation, [and] highway safety . . . ." *State v. Turner*, 78 Wn.2d 276, 280, 474 P.2d 91 (1970). Accordingly, scienter may be omitted from a regulatory or criminal offense when a person or business opts to engage in conduct that, if not performed with care, could result in harm to vulnerable third parties. *E.g.*, *United States v. Park*, 421 U.S. 658, 672-73, 95 S. Ct. 1903, 44 L. Ed. 2d 489 (1975) (holding that an executive who failed to remedy a contamination-causing rodent infestation in his company's food warehouse could be held criminally liable without proof of mens rea). Critically, the conscious decision to engage in such potentially high-stakes conduct is thought to place the doer on reasonable notice to take care. *Staples*, 511 U.S. at 607; *Posters 'N' Things*, 511 U.S. at 522.

B.      Washington's Strict Liability Drug Possession Statute Exceeds the Limits on the State's Authority Because It Imposes Felony Consequences for Innocent Conduct

The public welfare justification for permitting the removal of scienter from the State's burden of proof—and therefore running the risk of punishing innocent conduct—does not apply to Washington's basic drug possession law, though. The purpose of Washington's basic drug possession law is not to "heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare." *Morissette*, 342 U.S. at 254. Its purpose is instead substantively criminal.[9] And because unlawful possession may be both passive and unwitting, as in *Lambert*, there may be nothing to place the possessor on reasonable notice to take care to avoid possessing a controlled substance.

---

[9] To be sure, the narcotics statute in *Balint* was deemed a public welfare offense. *See* 258 U.S. at 253-54. However, that statute "must be understood in context. It predated the era during which all possession and sale of drugs came to be regarded as serious crimes. Aside from its penalty, it fairly can be characterized as a regulation." *United States v. Cordoba-Hincapie*, 825 F. Supp. 485, 507 (E.D.N.Y. 1993). *Balint* itself noted that the primary focus of the statute was taxation. 258 U.S. at 253. It just so happened to have an "incidental purpose" of regulating drugs. *Id.* By contrast, the punitive focus of Washington's drug statutes becomes unmistakably clear when one takes into account that disparities in drug enforcement are one of the primary drivers of the "color gap" in Washington's courts, prisons, and jails. Research Working Group of the Task Force on Race and the Criminal Justice System, *Preliminary Report on Race and Washington's Criminal Justice System*, 35 SEATTLE U. L. REV. 623, 627-28, 651-53 (2012).

This is especially true with respect to A.M. A.M. was not involved in business activities with significant third-party effects that would have put her on notice to take care to protect those third parties from harm. Rather, A.M. was involved in the business of being a child: She came to Goodwill with an adult. At Goodwill, that adult handed A.M. a child's monkey costume and a child's ladybug costume, both to be worn by the adult's children on Halloween. VRP (Feb. 14, 2017) at 28, 51, 107. A.M. placed the costumes inside a blue backpack. VRP (Feb. 14, 2017) at 28; Clerk's Papers (CP) at 37. An employee saw A.M. leave the store wearing the blue backpack. VRP (Feb. 14, 2017) at 29; CP at 37. This conduct—a juvenile's possession of drugs at the behest of an adult—does not place the public welfare at risk. *Cf. Anderson*, 141 Wn.2d at 365 (stating that unwitting possession of firearms does not pose a risk to third parties). Instead, the risk that accrued was a risk to A.M.—namely, that she might have discovered the drugs and become a user herself. *Cf.* RCW 69.50.406, .435(1)(a)-(d); *Leyve Coria*, 120 Wn.2d at 172-73.

Indeed, as the Louisiana Supreme Court recognized, a statute such as Washington's sweeps in entirely innocent conduct. *Brown*, 389 So. 2d at 51. A person might pick up the wrong bag at the airport, the wrong jacket at the concert, or even the wrong briefcase at the courthouse. Or a child might carry an adult's

27

backpack, not knowing that it contains the adult's illegal drugs.[10] All this conduct

is innocent; none of it is blameworthy. *Cf. X-Citement Video*, 513 U.S. at 69

(warning against criminalizing a store clerk's unwitting distribution of child

pornography when the clerk "returns an uninspected roll of developed film

[containing child pornography] to a customer"); *Staples*, 511 U.S. at 614-15

(refusing to read statute to "impose criminal sanctions on a class of persons whose

mental state . . . makes their actions entirely innocent"). "'As these examples

illustrate, even people who are normally diligent in inspecting and organizing their

possessions may find themselves unexpectedly in violation of this law, and without

the notice necessary to defend their rights.'" *State v. Adkins*, 96 So. 3d 412, 432

(Fla. 2012) (Perry, J., dissenting) (quoting lower court's decision). Such lack of

notice, itself a result of the criminalization of innocence, is precisely what

---

[10] Truly, the examples abound. Other instances of innocent possession include "a letter carrier who delivers a package containing unprescribed Adderall; a roommate who is unaware that the person who shares his apartment has hidden illegal drugs in the common areas of the home; a mother who carries a prescription pill bottle in her purse, unaware that the pills have been substituted for illegally obtained drugs by her teenage daughter, who placed them in the bottle to avoid detection." *State v. Adkins*, 96 So. 3d 412, 432 (Fla. 2012) (Perry, J., dissenting) (citing lower court's decision). Still "[o]ther examples of innocent possession spring easily and immediately to mind: a driver who rents a car in which a past passenger accidentally dropped a baggie of [drugs] under the seat; . . . a helpful college student who drives a carload of a friend's possessions to the friend's new apartment, unaware that a stash of heroin is tucked within those possessions; an ex-wife who is framed by an ex-husband who planted cocaine in her home in an effort to get the upper hand in a bitter custody dispute." *Id.* "The list is endless." *Id.*

prompted the United States Supreme Court to strike down the vagrancy ordinance in *Papachristou.*

The State's promise, made at oral argument, that it will not prosecute the innocent is not enough to solve this problem.[11] "Where, as here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law." *Papachristou*, 405 U.S. at 170. The state and federal constitutions promise Washingtonians the rule of law, not the unfettered discretion of the local prosecutor.

Of course, this might not be a problem if there were other elements of the offense that included a mens rea element. Seemingly uniquely, Washington's drug statute eliminates mens rea in its entirety. Even when the United States Supreme Court has permitted "strict liability" offenses, the Court has still required proof "at least that the defendant know that he is dealing with some dangerous or deleterious substance." *Staples*, 511 U.S. at 607 n.3 (citing *Int'l Minerals*, 402 U.S. at 563-64). For example, the "strict liability" statute in *United States v. Freed* required the defendant to have knowledge "that the instrument possessed was a

---

[11] Wash. Supreme Court oral argument, *State v. A.M.*, No. 96354-1 (May 28, 2019), at 34 min., 48 sec., to 36 min., 23 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?eventID=2019051105.

firearm"—meaning that the defendant must have knowledge of the possession itself, even if federal prosecutors need not prove that the defendant knew the possessed firearm was unregistered. 401 U.S. 601, 607, 91 S. Ct. 1112, 28 L. Ed. 2d 356 (1971) (citing *Sipes v. United States*, 321 F.2d 174, 179 (8th Cir. 1963)); *see id.* at 612 (Brennan, J., concurring in judgment). This approach, unlike Washington's, "avoid[s] . . . impos[ing] a rigorous form of strict liability." *Staples*, 511 U.S. at 607 n.3 (citing *Int'l Minerals*, 402 U.S. at 563-64); *see also Brown*, 389 So. 2d at 50-51 (recognizing that an offense completely lacking in any mens rea element is materially different from the offense in *Freed*).

Moreover, there might not be any problem if conviction for basic drug possession did not impose harsh consequences and brand the defendant a felon. *Freed*, 401 U.S. at 613 n.4 (Brennan, J., concurring in judgment) (acknowledging that the legislature may create strict liability offenses "'where the penalty is relatively small, where conviction does not gravely besmirch,'" and where other requirements are met (quoting *Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960))). But that is exactly what Washington's statute does. A basic drug possession conviction is generally a class C felony, which can result in up to five years' imprisonment and a $10,000 fine. RCW 69.50.4013(2); RCW 9A.20.021(1)(c). Numerous collateral consequences—affecting basic

aspects of life, such as housing, government benefits, and professional licensure—

follow. *See generally* Michael Pinard & Anthony C. Thompson, *Offender Reentry*

*and the Collateral Consequences of Criminal Convictions: An Introduction*,

30 N.Y.U. REV. L. & SOC. CHANGE 585 (2006); Tarra Simmons, *Transcending the*

*Stigma of a Criminal Record: A Proposal to Reform State Bar Character and*

*Fitness Evaluations*, 128 YALE L. J. F. 759 (2019). And "drug offenses 'are

subjected to more and harsher collateral consequences than any other category of

crime.'" Pinard & Thompson, *supra*, at 588 (quoting Gabriel J. Chin, *Race, the*

*War on Drugs, and the Collateral Consequences of Criminal Conviction*, 6 J.

GENDER, RACE & JUST. 253, 259 (2002)).

In my view, the harsh consequences of this statute, paired with the innocent

conduct that it criminalizes, and the lack of a public welfare rationale render the

statute unconstitutional in violation of the Fourteenth Amendment.[12]

---

[12] The state constitutional prohibition on cruel punishment, WASH. CONST. art. I, § 14, or the federal prohibition on cruel and unusual punishment, U.S. CONST. amend. VIII, might provide another basis for relief. *Cf.* Wash. Supreme Court oral argument, *supra*, at 19 min., 32 sec. to 20 min., 5 sec.; and 21 min., 32 sec. to 22 min., 48 sec.; *Lambert*, 355 U.S. at 231 (Frankfurter, J., dissenting) (recognizing that "a cruelly disproportionate relation between what the law requires and the sanction for its disobedience may constitute a violation of the Eighth Amendment" to the United States Constitution). *But see State v. Schmeling*, 191 Wn. App. at 797-801 & nn.3-4 (holding that convictions under the basic drug possession statute do not violate the Eighth Amendment but noting that no Washington Constitution article I, section 14 argument was raised). But A.M. presents her claim as a Fourteenth Amendment due process claim, and *Lambert* identified the Fourteenth Amendment as the basis for striking down the

CONCLUSION

This court must grapple with its own errors. *Cleppe*'s and *Bradshaw*'s

statutory interpretation cannot be justified. Their saving grace is the legislature's

inaction. But even if *Cleppe* and *Bradshaw* do reflect legislative intent, their result

remains impermissible under the Fourteenth Amendment. The legislature cannot

declare a broad swath of innocent conduct felonious when no public welfare

rationale exists.

I respectfully concur.

---

strict liability ordinance at issue in that case. So I have addressed A.M.'s claim within
that framework.

_Gordon McCloud, J._

_González, J._