IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80898-2-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| THOMAS LYLE CLAYBROOK, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Thomas Claybrook challenges his convictions for felony harassment, unlawful imprisonment, and second degree assault arising out of the brutal beating of his girlfriend, R.C. Claybrook, who represented himself at trial, contends the trial court violated his right to be present when it removed him from the courtroom during the direct examination of R.C. without first warning him that his disruptive and disrespectful behavior could lead to his removal. Claybrook also argues that convicting him of two counts of assault for what he contends was a single course of conduct violates the constitutional prohibition against double jeopardy.

We conclude that the trial court erred by removing Claybrook from the courtroom without first warning him that his disruptive behavior could result in his

Citations and pin cites are based on the Westlaw online version of the cited material.

removal but this error was harmless beyond a reasonable doubt. We further conclude that there is no double jeopardy violation and thus affirm his convictions.

FACTS

R.C. met Claybrook in October of 2018 and the two were dating by January 2019. Claybrook often stayed with R.C. in her Shoreline apartment. After they began dating, Claybrook became controlling, often going through R.C.'s phone to monitor her contacts with friends and requiring her to end friendships with other men.

On February 24, 2019, R.C. resigned from her job and spent the day with Claybrook. R.C. had discovered something disturbing about Claybrook's past and wanted to confront him about it.[1] Feeling upset, R.C. decided to have a few alcoholic drinks with Claybrook to "help out with the tension." When they arrived at her apartment, R.C. confronted Claybrook about his past. Claybrook, who wanted to have sex with R.C., became "more and more upset" when she refused his sexual advances and insisted on discussing his past. They argued for 15 to 20 minutes before R.C. felt that "enough was enough" and told Claybrook to leave.

R.C. testified that Claybrook then punched her in the head as she tried to walk away, causing her to see stars and fall to the floor. Claybrook straddled R.C. and threatened to kill her. Terrified, R.C. tried to appease Claybrook and offered to "go lay back in bed" and give in to being intimate with him, but Claybrook stated he did not trust her enough to let her up.

---

[1] R.C. had discovered that Claybrook had previously been convicted of child molestation. In order to avoid undue prejudice to Claybrook, the prosecutor agreed to elicit only that R.C. had "discovered something from his past that was upsetting to her."

When he threatened her again, R.C. screamed for help, hoping someone nearby might hear her. Claybrook put his hands around her neck and strangled her until she blacked out. R.C. was unsure how long she was unconscious but Claybrook was still sitting on her when she regained consciousness.

R.C. told Claybrook she needed to use the bathroom, where she planned to use her phone to call for help. Claybrook let her get up off the floor, but refused to let R.C. close the door and insisted on watching her while she used the toilet.

When Claybrook turned to lock the sliding door to the apartment, R.C. ran to the kitchen in only her underwear and grabbed a small knife to defend herself. She told Claybrook she wanted to leave and would stab him if he came near her. Claybrook knocked the knife out of R.C.'s hand. R.C. attempted to escape out her front door but Claybrook slammed the door shut before she could get out. Claybrook locked the door and began beating R.C. with his fists. R.C. tried to alert her neighbors by banging on the walls and shouting for help. In response, Claybrook dragged her into the bathroom by her hair and told her to stay there until he left the apartment. She looked in the mirror and could see that one eye was swollen shut, and there was blood everywhere.

R.C. grabbed a small pair of scissors from the bathroom and again tried to escape while Claybrook was packing up his belongings. With the scissors hidden behind her back, R.C. pleaded with Claybrook to let her leave. When Claybrook tried to shove her back into the bathroom, R.C. lunged at him with the scissors. Claybrook wrestled the scissors from her and used them to stab R.C. in the back

of her head, her back, and her left arm. Claybrook then shoved her back into the bathroom and closed the door.

R.C. again attempted to flee. She grabbed a decorative rock that she kept on a nearby table and struck Claybrook in the head when he approached her. Claybrook staggered backwards and R.C. ran for the door. Before R.C. could open the door, Claybrook caught her and punched her again to prevent her from leaving. While Claybrook was locking the door, R.C. picked up a metal luggage dolly and tried unsuccessfully to hit him with it. Claybrook seized the dolly from her and beat her with it, striking her multiple times in the head and torso until she was "seeing stars" and having trouble with her vision.

Claybrook continued packing his bags, and R.C. made a fourth attempt to escape. When Claybrook again tried to intervene, she kicked him in the groin and was finally able to escape. Once outside the apartment, R.C. began screaming and knocking on neighbors' doors.

R.C.'s neighbor, Margaret Studley, testified that she called 911 after hearing a loud "thump and then kind of a dragging sound," followed by a woman's voice screaming. Studley thought the noises sounded "very violent" and that the woman seemed to be "in real trouble." As Studley went into the hallway to meet responding deputies, R.C. burst out of her apartment exclaiming "he's killing me, he's trying to kill me. . . ."

Several King County Deputy Sheriffs responded to R.C.'s apartment within approximately three minutes of the 911 call. Detective Edgar Pena and Deputy Sean Nelson observed Claybrook jump down from R.C.'s low balcony and quickly

walk away. When they contacted Claybrook outside the apartment, he was sweating profusely and his face, neck, hands, and clothes were covered in blood. Suspecting Claybrook was involved in the incident, Detective Pena detained him.

Meanwhile, Deputies Robert Knight and Sean Barber entered the apartment building and found R.C. cowering in the hallway, dressed in only a T-shirt and underwear. She was "screaming, crying, and just covered in blood and had very obvious injuries." She was "bleeding from pretty much every orifice of her face," which was "extremely swollen," and she had "obvious strangulation marks around her neck." She also had a number of "small stab-type wounds." She was hysterical and extremely anxious, which made questioning her difficult, but she was able to report that Claybrook had strangled and beaten her and stabbed her with scissors. She repeatedly told officers and medical responders that she was afraid that Claybrook was going to kill her.

Deputies saw R.C.'s apartment was in total disarray. There were "items on the floor, items broken, and things knocked over." There was blood spattered on the walls and floor, a pool of blood in the living room, and blood throughout the bathroom. They also found a "fairly large" tuft of what looked like R.C.'s hair on the ground.

R.C. was transported to Northwest Hospital where her injuries, including two nasal bone fractures and multiple lacerations to her face and hands, were treated.

The State charged Claybrook with two counts of second degree assault, one count of felony harassment, and one count of unlawful imprisonment. All were

charged as domestic violence offenses. One of the assault charges further alleged that Claybrook had been armed with a deadly weapon when he hit R.C. with the metal dolly and that this assault caused a level of injury substantially greater than necessary to accomplish the crime.

Claybrook represented himself at trial. Throughout the trial and pre-trial hearings, Claybrook was unruly and disruptive. He frequently argued with the trial court and interrupted the prosecutor's examination of witnesses with non-legal objections and inappropriate commentary on the testimony. His attempts to cross-examine witnesses sometimes devolved into confused and tangential diatribes, despite the court's repeated admonitions that he needed to ask appropriate questions.

During the direct examination of R.C., Claybrook became extremely disruptive. He repeatedly "objected" and interrupted R.C.'s answers with his own testimony about the incident and began fake-coughing words like "bullshit" and "extortion." After Claybrook's interruptions became so persistent that R.C. could not focus enough to carry on with her testimony, the trial court excused the jury so that it could address the issue with Claybrook. When the trial court reprimanded Claybrook for his behavior and attempted to advise him on how to properly object, Claybrook became antagonistic. The court responded

> THE COURT: You're going to be removed, and you can watch the rest—
>
> MR. CLAYBROOK: No, f[***], I object to that, too.
>
> THE COURT: —of the proceeding. You can watch the proceedings.
>
> MR. CLAYBROOK: She's f[***]ing lying.

THE COURT: And then I'll bring you back for cross-examination.

Claybrook became angry and shouted at the court that his objections were proper and demanded to know what "playbook" the court was using. The trial court reiterated

THE COURT: You're going to be removed.

MR. CLAYBROOK: No, I'm not.

THE COURT: You can watch the remainder—

MR. CLAYBROOK: I object. You said 3.5.

THE COURT: —of the direct examination—

MR. CLAYBROOK: F[***] no.

THE COURT: —in a courtroom, but I am not going to—

MR. CLAYBROOK: It says right here if you're lying, I can object.

THE COURT: —listen and I'm not going to have her subjected to this type of behavior. . . . And we will set up the video cart. I'm doing this reluctantly because the witness is uncomfortable. She asked me to stop because she cannot focus. . . . We'll bring you back, but we're not going to continue like this.

The trial court had Claybrook escorted to a different room in the courthouse, in which there was a remote video screen that allowed him to watch a live camera feed of the courtroom proceedings. As Claybrook watched the remainder of R.C.'s testimony, he attempted to shout at her and "curse[] her out," unaware that his microphone was muted. After the video technician informed him that no one in the courtroom could hear him, he continued cursing at R.C. and eventually began yelling at the officers present in the remote observation room.

The trial court permitted Claybrook to return to the courtroom to cross-examine R.C. The trial court warned Claybrook that it would cut him off if he argued with R.C. or used cross-examination as an opportunity to testify. Claybrook cross-examined R.C. without incident.

The jury convicted Claybrook on all charges, entered special verdicts finding the crimes were domestic violence offenses and, for the assault in count 4, found that Claybrook was armed with a deadly weapon and that R.C.'s injuries substantially exceeded that necessary for the crime. The trial court imposed an exceptional 119-month sentence based on these aggravating factors. Claybrook appeals.

## ANALYSIS

A. Constitutional Right to be Present at Trial

Claybrook first argues that his removal from the courtroom during R.C.'s testimony violated his constitutional right to be present at trial. We agree but conclude that this error was harmless beyond a reasonable doubt.

Criminal defendants have a constitutional right to be present at trial. State v. Davis, 195 Wn.2d 571, 578, 461 P.3d 1204 (2020); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. But that right is not absolute. State v. Chapple, 145 Wn.2d 310, 318, 36 P.3d 1025 (2001). A defendant's persistent, disruptive conduct can constitute a voluntary waiver of the right to be present in the courtroom. State v. DeWeese, 117 Wn.2d 369, 381, 816 P.2d 1 (1991); Illinois v. Allen, 397 U.S. 337, 343, 90. S. Ct. 1057, 25 L. Ed. 2d 353 (1970). This court reviews de novo whether a defendant's constitutional right to be present has been

violated.  State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011) (citing State v. Strode, 167 Wn.2d 222, 225, 217 P.3d 310 (2009)).

While the appropriate method for dealing with a disruptive defendant should be left to the trial judge's discretion, Washington courts recognize basic guidelines to assist trial courts in exercising their discretion.  Chapple, 145 Wn.2d at 320.  First, the trial court must warn the defendant that his conduct may lead to removal.  Id.  Second, the defendant's conduct must be severe enough to justify removal.  Id.  Third, the trial court should employ the least severe alternative that will prevent the defendant from disrupting the trial.  Id.  Fourth, the defendant must be allowed to reclaim his right to be present upon assurances that his or her conduct will improve.  Id.  These guidelines are intended to ensure that trial courts exercise their discretion in a manner that affords defendants a fair trial while maintaining the safety and decorum of the proceedings.  Id.

Claybrook argues, and the State concedes, that the trial court violated his right to be present at trial when it removed him without first warning him that continued disruptive behavior could result in removal.  In this case, the trial court's first statement to Claybrook regarding his removal was a definitive statement that he was going to be removed and that he could watch the proceedings from a remote location and return to cross-examine R.C.  Despite Claybrook's persistently disruptive behavior throughout the entirety of the trial and pre-trial hearings, the court never discussed the potential consequences of his actions.  Therefore, we accept the State's concession and conclude that the trial court violated his right to be present at trial.

While the State acknowledges that the trial court erred in removing Claybrook without the requisite warnings, it argues that this error was harmless beyond a reasonable doubt. We agree.

The violation of a defendant's right to be present at trial is subject to harmless error analysis. Irby, 170 Wn.2d at 885. The State has the burden of proving the error was harmless, and must do so beyond a reasonable doubt. Id. at 886. A constitutional error is harmless if we are convinced beyond a reasonable doubt that the jury verdict would have been the same absent the error. State v. A.M., 194 Wn.2d 33, 41, 448 P.3d 35 (2019). The error is harmless if the untainted evidence is "'so overwhelming that it necessarily leads to a finding of guilt.'" State v. Frost, 160 Wn.2d 765, 782, 161 P.3d 361 (2007) (quoting State v. Guloy, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985)).

Claybrook argues that his removal from the courtroom was prejudicial because he lacked the ability to object to "gruesome, disturbing, and duplicative" photographs that were admitted in his absence.

During R.C.'s direct testimony, the State introduced a number of pictures showing the injuries she suffered. Many of the photos depicting R.C.'s bloody face, taken on the night of Claybrook's arrest, were admitted without objection from Claybrook. Exhibits 83 through 90, which were admitted in Claybrook's absence, depicted R.C.'s injuries at different points in time during the week following the assault. Claybrook contends that the latter set of photos were unnecessarily gruesome and duplicative of photographs the court had already admitted and that, had he been present, he would have objected to their admission.

Claybrook, however, has failed to demonstrate that the trial court would have sustained such an objection. Gruesome photos are admissible if their probative value outweighs their prejudicial effect. State v. Hoffman, 116 Wn.2d 51, 88, 804 P.2d 577 (1991). The State offered the photos to establish one of the alleged aggravating factors—whether R.C.'s injuries "substantially exceeded the level of bodily harm necessary to constitute substantial bodily harm, as defined in Instruction 21." "Substantial bodily harm" was defined in Instruction 21 as "bodily injury that involves a temporary but substantial disfigurement, or that causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or that causes a fracture of any bodily part." These post-hospitalization photographs were highly probative of the severity of R.C.'s injuries and the duration of her suffering. Additionally, while the photos did depict bruising and suturing, they were no more graphic than photographs of R.C.'s injuries on the night of the assault, to which Claybrook raised no objection. Claybrook thus has not demonstrated that the unfair prejudicial impact of admitting Exhibits 83 to 90 outweighed their probative value.

It is similarly unlikely the trial court would have excluded the photos as duplicative. While similar to other photos of R.C., these exhibits showed the jury R.C.'s injuries in the days following the event, rather than at the time of the event. They were not identical to other photographic exhibits and served the unique purpose of showing how R.C.'s injuries healed over time.

More significantly, even if the trial court had excluded the contested photos, there is overwhelming untainted evidence demonstrating Claybrook's guilt. R.C.

immediately identified Claybrook as her attacker when police arrived and again at trial. She testified in great detail about how he strangled and brutally beat her. Her testimony was corroborated by her injuries, which included a broken nose, minor stab wounds, and "obvious strangulation marks around her neck." When responding officers arrived on the scene just minutes after Studley called 911, they found Claybrook leaving R.C.'s apartment via her balcony. He was covered in blood and sweating profusely. The police searched R.C.'s apartment and found no one else there. There is overwhelming untainted evidence that Claybrook assaulted, imprisoned, and threatened to kill R.C.

Claybrook also contends that his absence from the courtroom for a portion of R.C.'s testimony was inherently prejudicial because the jurors may have drawn improper conclusions about his absence. This contention is entirely speculative. There is nothing to suggest Claybrook's temporary absence from the courtroom contributed to the jury verdict, especially in the light of the overwhelming amount of untainted evidence that demonstrated his guilt.

We are convinced beyond reasonable doubt that the verdict would have been the same had Claybrook not been erroneously removed from the courtroom. This error was harmless.

B. Double Jeopardy

Claybrook next argues the double jeopardy clause bars his two assault convictions because the acts constituted a single course of conduct. The record does not support this argument.

The double jeopardy provisions of the federal and state constitutions protect a defendant from being punished multiple times for the same offense. State v. Muhammad, 194 Wn.2d 577, 615-16, 451 P.3d 1060 (2019) (opinion of Gordon McCloud, J.); WASH. CONST. art. I, § 9; U.S. CONST. amend V. This court reviews double jeopardy claims de novo. State v. Villanueva-Gonzalez, 180 Wn.2d 975, 979-80, 329 P.3d 78 (2014).

In order to "avoid the risk of a defendant being 'convicted for every punch thrown in a fistfight,'" we consider assault a course of conduct crime. Id. (quoting State v. Tili, 139 Wn.2d 107, 116, 985 P.2d 365 (1999)). The ultimate determination of whether multiple assaultive acts constitute one course of conduct depends on a totality of the circumstances. Id. at 985. To guide its analysis, this court considers (1) whether the acts took place over a lengthy period of time or occurred in rapid succession, (2) whether the acts took place in the same location, (3) whether the defendant had different motivations for the different acts, (4) whether the acts were interrupted by any intervening events, and (5) whether there was an opportunity for the defendant to reconsider his actions. Id. No one factor is dispositive. Id.

The jury convicted Claybrook of two counts of assault in the second degree. During closing arguments, the State indicated that the first assault charge was based on Claybrook's strangulation of R.C., and the second was based on Claybrook's physical attack of R.C. with the metal dolly, after she tried to escape the apartment for the third time. Weighing the totality of the circumstances in this case, we conclude that the assaultive acts at issue here do not constitute a single

course of conduct and that Claybrook's convictions do not violate the prohibition against double jeopardy.

While both assaults occurred in the same location—R.C's apartment—and Claybrook's motive for each—to prevent R.C. from seeking help—appears to have been the same, they occurred over a significant period of time and were interrupted by several intervening events during which Claybrook had time to reconsider his actions.

First, Claybrook's assaultive acts occurred over a significant period of time. R.C. testified they arrived at her apartment between 8:30 p.m. and 8:45 p.m. and that she confronted him about his past within a half hour of arriving home, sometime between 9:00 p.m. and 9:15 p.m. They then argued for about 15 to 20 minutes before he knocked her to the floor and strangled her. From this evidence, the first assault occurred sometime between 9:15 p.m. and 9:35 p.m. The second assault, where Claybrook repeatedly struck R.C. with the metal dolly, occurred shortly before police arrived just after 10 p.m. Thus, there would have been somewhere between 25 and 45 minutes between the two charged assaults.

Second, the record demonstrates multiple periods of relative calm between the assaults. After Claybrook strangled R.C., but before he beat her with the metal dolly, Claybrook allowed her to get up and use the toilet. He stood by watching while she used the bathroom, and then walked away to the sliding door. After she tried to escape, Claybrook twice physically forced her into the bathroom. The first time, R.C. had time to look at herself in the mirror and assess her injuries. Not

- 14 -

until R.C.'s third attempt to escape the apartment did Claybrook beat her with the metal dolly.

Finally, these intervening events demonstrate that Claybrook had opportunities to reconsider his actions after he strangled R.C. For instance, Claybrook told R.C. that he was not sure if he could trust her enough to let her up from the floor, and when she was using the bathroom, he stood there calmly monitoring her before locking the sliding door. When R.C. tried to escape, he forced her into the bathroom, told her to stay there, and began packing his bags to leave. This clearly shows that Claybrook was considering his actions, contemplating what he should do next, and planning to leave before R.C. could report the incident or seek help. Thus, he had adequate time to reconsider his assaultive actions before he pummeled her with the metal dolly.

Claybrook analogizes his case to Villanueva-Gonzalez and In re Personal Restraint Petition of White, 1 Wn. App. 2d 788, 407 P.3d 1173 (2017). In Villanueva-Gonzalez, the defendant head-butted his girlfriend, breaking her nose, and then grabbed her by the neck and strangled her. 180 Wn.2d at 978. A jury convicted Villanueva-Gonzalez of two separate counts of assault. Id. at 979. The Washington Supreme Court held that the defendant's actions constituted one course of conduct because they took place in the same location, over a short time period with no interruptions, and with no evidence suggesting a different motivation, intent, or opportunity to reconsider his actions. Id. at 985-86.

In White, following an argument over child custody, the defendant pointed a gun at his girlfriend, threatened to kill her, then pushed her to the floor where he

beat and strangled her. 1 Wn. App.2d at 790. A jury convicted White of two counts of second degree assault for this conduct. White argued these convictions violated double jeopardy. Id. at 791. This court agreed, noting that the assaultive acts at issue appeared to be based on the same motive and occurred in the same location within a short period of time, with no evidence of interruptions, periods of calm, or time for White to reconsider his actions. Id. at 796. That incident was "one continuous struggle from the time White pointed a gun at [the victim] to throwing her on the floor and beating her to the time he began to strangle her." Id. at 796.

The State, by contrast, relies on State v. Aquiningoc, noted at 188 Wn. App. 1038 (2015), and State v. Pinkney, noted at 11 Wn. App. 2d 1079 (2020).[2] In Aquiningoc, the defendant was convicted of second and fourth degree assault following a violent incident involving his estranged wife. 2015 WL 4090100 at *2. For some unspecified period of time, Aquiningoc and his wife calmly discussed the possibility of reconciliation but he became verbally and physically abusive as their discussion progressed. Id. at *1. After assaulting his wife, he began packing his clothes from the closet and his wife fled to the master bathroom. When he finished packing, he found his wife in the master bathroom and slapped her so forcefully that she banged her head on the toilet. Id. at *2. This court rejected Aquiningoc's double jeopardy claim because the two assaults were not a continuous course of conduct and the facts were distinguishable from those of Villaneuva-Gonzalez. It concluded that "the assaultive acts in this case occurred over a relatively long period of time, during which Aquiningoc and his victim moved to several locations

---

[2] Under GR 14.1(c), we cite these cases here because doing so is necessary for a reasoned decision.

throughout the apartment." Id. at *4. And the first assault was "punctuated by several instances of relative calm," during which the defendant had opportunities to reconsider his actions. Id. at *4. The court rejected his double jeopardy claim on this basis.

Likewise, in Pinkney, we rejected the argument that two second degree assault convictions violated double jeopardy. In that case, the defendant got drunk and began threatening his girlfriend. 2020 WL 1893662 *1. When she went into the bedroom to call 911, Pinkney came into the room, grabbed her by the neck and squeezed. Id. at *1. He let go, pushed her onto the bed and left the room. Id. He returned to the bedroom as she was begging him to leave and strangled her a second time. Id. at *1-2. This court again distinguished the facts from those of Villaneuva-Gonzalez, and concluded there was no double jeopardy violation even though both assaults occurred in the girlfriend's bedroom and occurred over a short period of time because when Pinkney stopped the first assault and left the bedroom, he had the opportunity to reconsider his actions and made the decision to assault her again. Id. at * 3. The court also found Pinkney's intent during the second assault appeared different than the first assault because the second was more serious and he seemed determined to cause her more physical harm. Id.

Claybrook's case is more analogous to Aquiningoc and Pinkney than either Villanueva-Gonzalez or White. In contrast to Villanueva-Gonzalez and White, Claybrook's assaultive acts occurred over a significant period of time. Rather than multiple, rapid-fire assaults, Claybrook's assaults happened over a minimum of 25 minutes. And the assaultive acts were not continuous over this time. Rather, as

in <u>Aquiningoc</u>, Claybrook's assaults were separated by moments of relative calm, such as when R.C. was using the toilet or when he was focused on packing his bags. And like <u>Pinkney</u>, Claybrook left R.C. alone in the bathroom after initially strangling her, giving him sufficient opportunity to reconsider his actions. These intervening events demonstrate that Claybrook had opportunities to reconsider his actions after he strangled her. He nevertheless chose to assault R.C. a second time with the metal dolly to prevent her from leaving the apartment.

Considering the totality of the circumstances, we conclude Claybrook's two assault convictions did not violate double jeopardy.

We affirm.

Andrus, A.C.J.

WE CONCUR:

Mann, C.J.

Dwyer, J.