**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**FILED**
**MAY 5, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No.   37905-1-III |
| | ) | |
| JEROME LIONEL PLEASANT, | ) | |
| | ) | ORDER GRANTING MOTION |
| Petitioner. | ) | TO PUBLISH OPINION |
| | ) | |

THE COURT has considered the Respondent's motion to publish the court's opinion of March 8, 2022, and the record and file herein, and is of the opinion the motion should be granted. Therefore,

IT IS ORDERED, the motion to publish is granted. The opinion filed by the court on March 8, 2022, shall be modified on page 1 to designate it is a published opinion and on page 23 by deletion of the following language:

> A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

PANEL: Judges Siddoway, Fearing, Pennell

FOR THE COURT:

_____
LAUREL H. SIDDOWAY
Chief Judge

**FILED**
**MARCH 8, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | |
| | ) | No. 37905-1-III |
| JEROME LIONEL PLEASANT, | ) | |
| | ) | UNPUBLISHED OPINION |
| Petitioner. | ) | |
| | ) | |

SIDDOWAY, J. — Jerome Lionel Pleasant seeks relief from a claimed unlawful restraint imposed for his 2017 Franklin County convictions for unlawful possession of a controlled substance with intent to deliver (cocaine) and unlawful possession of a controlled substance (hydrocodone).

In addition to challenging the validity of his simple possession conviction, which the State agrees must be vacated, Mr. Pleasant contends he received ineffective assistance of counsel when his trial lawyer failed to offer dashboard camera (dash cam) recordings as evidence in support of a motion to suppress. He also contends that in light of the unconstitutionality of former RCW 69.50.4013 (2017) established by *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021), probable cause was lacking for the vehicle search in which the evidence of his crimes was seized.

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

The State advances several arguments in response to these latter two challenges to Mr. Pleasant's convictions. We find two of its arguments dispositive: Mr. Pleasant does not demonstrate that the failure to offer the dash cam evidence actually prejudiced him, and the invalidation in 2021 of former RCW 69.50.4013 does not invalidate a search that was supported by probable cause at the time it was authorized in 2016. We grant Mr. Pleasant's request that we remand with directions to vacate his simple possession conviction and deny his remaining requests for relief.

PROCEDURAL BACKGROUND

Mr. Pleasant's 2017 convictions stemmed from evidence found in the search of a car he was driving at the time he was stopped for a traffic infraction by Pasco Police Detective Jeremy Jones. He appealed his convictions, challenging them in part on the basis that the trial court erred in finding that the infraction was not a pretextual basis for the stop. This court affirmed the convictions in an unpublished decision. *State v. Pleasant*, No. 35645-1-III (Wash. Ct. App. Oct. 24, 2019) (unpublished) https://www.courts.wa.gov/opinions /pdf/356451_unp.pdf.

In moving to suppress the evidence in the trial court, Mr. Pleasant argued that before pulling him over, Detective Jones watched as a man entered the passenger side of Mr. Pleasant's parked car, where he remained for only 30 seconds before stepping out and leaving on foot. It was after the passenger left that Mr. Pleasant drove away from the gas station where he had been parked, failing to stop before crossing a sidewalk. While it

2

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

was an infraction for Mr. Pleasant to fail to stop, Mr. Pleasant argued that the real reason

for the stop was Detective Jones's suspicion about what had just transpired between Mr.

Pleasant and his momentary passenger.

This court rejected the trial court's finding that the sole reason for Detective

Jones's stop had been the traffic violation. It nonetheless concluded that the court did not

err by denying the suppression motion, explaining:

> On cross-examination, Jones tacitly admitted that the suspicious activity he witnessed before the infraction played a role in his decision to stop Pleasant. He tacitly admitted as much when he denied that the suspicious activity was the sole or *major reason* for the stop, and testified that "[t]he major reason for the stop . . . was the sidewalk [infraction]." [Report of Proceedings [(]RP[)] at 23 (emphasis added).

> In [*State v. Chacon*] *Arreola*, the court determined the constitutionality of a mixed-motive stop. The court held, "[a] mixed motive stop does not violate article I, section 7 so long as the police officer making the stop exercises discretion appropriately." [*Chacon*] *Arreola*, 176 Wn.2d [284,] 298[, 290 P.3d 983 (2012)]. In other words, to pass constitutional muster, the police officer must make "an independent and conscious determination that a traffic stop to address a suspected traffic infraction is reasonably necessary in furtherance of traffic safety and the general welfare." *Id.* at 298-99. Nor does it matter that the traffic infraction is the secondary reason for the stop. *Id.* at 299. Even officers whose suspicions have been aroused may enforce the traffic code. *State v. Nichols*, 161 Wn.2d 1, 11, 162 P.3d 1122 (2007).

> The record supports the stop here. Jones had stopped over 39 cars for the sidewalk infraction during the past 12 months and had issued 13 citations. There is no evidence that some or most of these stops were made only after witnessing suspicious activity unrelated to driving. Jones's practice of enforcing the sidewalk infraction evidences an independent and conscious determination that he believed the stop was reasonably necessary to ensure traffic safety and the general welfare.

3

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

*Id.*, slip op. at 6-7.

This court's mandate issued on December 19, 2019. The present personal restraint petition, Mr. Pleasant's first, was filed with this court on December 14, 2020. After the *Blake* opinion was issued in early 2021, Mr. Pleasant moved for leave to file an amended petition, which was granted.

ALLEGED UNLAWFUL RESTRAINT AND ANALYSIS

Mr. Pleasant's opening brief in support of his personal restraint petition (PRP) contends he was denied effective assistance of counsel when his trial lawyer failed to present recordings from Detective Jones's dash cam at the suppression hearing. The recordings captured conversations the detective had with other officers before and after the stop. Mr. Pleasant's trial lawyer had relied at the suppression hearing on a partial transcript rather than the recordings themselves. Mr. Pleasant now argues that the transcript Mr. Pleasant's trial lawyer relied on is not entirely accurate; legally relevant audio is missing from the transcript; and the recordings were needed to provide context, impeach Detective Jones, and competently argue the suppression motion.

In his amended brief, Mr. Pleasant makes the supplemental claim that the Supreme Court's decision in *Blake* "invalidates the search warrant for Mr. Pleasant's vehicle." Am. Br. in Support of PRP at 21. Alternatively, he argues that it requires that his conviction for simple possession be vacated.

We address the requests for relief in the order presented.

4

No. 37905-1-III
*In re Pers. Restraint of Pleasant*


I.     MR. PLEASANT DOES NOT DEMONSTRATE A REASONABLE PROBABILITY THAT IF THE DASH CAM RECORDINGS HAD BEEN OFFERED, THE OUTCOME OF THE SUPPRESSION HEARING WOULD HAVE BEEN DIFFERENT

To obtain relief through his PRP, Mr. Pleasant must show actual and substantial prejudice resulting from alleged constitutional errors, or for alleged nonconstitutional errors a fundamental defect that inherently results in a complete miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). He must make this showing by a preponderance of the evidence. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013).

Mr. Pleasant's request for relief based on alleged ineffective assistance of counsel presents an alleged constitutional error. Effective assistance of counsel is guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To demonstrate ineffective assistance of counsel, Mr. Pleasant must show that "(1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). A reasonable probability is "'a probability sufficient to

5

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

undermine confidence in the outcome.'" *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004) (quoting *Strickland*, 466 U.S. at 694).

A petitioner claiming ineffective assistance of counsel necessarily establishes the "actual and substantial prejudice" required for collateral relief if he meets the standard of prejudice applicable on direct appeal: that but for counsel's deficient performance there is a reasonable probability the outcome would have been different. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017).

To demonstrate ineffective assistance of counsel, both the deficient representation and prejudice prongs must be shown. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697. It is easier to dispose of Mr. Pleasant's claim on the ground of lack of sufficient prejudice.

After being provided by the State with copies of two dash cam recordings of Detective Jones's traffic stop and detention of Mr. Pleasant, defense counsel filed a motion to suppress. At the suppression hearing, Detective Jones testified that he only began following Mr. Pleasant's car after seeing him commit the traffic infraction of

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

failing to stop at a sidewalk when emerging from an alley, driveway or building.[1] The detective testified that at the time he observed the infraction, he was in his street crimes unit car, parked in a Papa Murphy's parking lot across the street from a Conoco gas station, eating or writing a report. He was parked facing the street and observed Mr. Pleasant's car in the Conoco lot. He testified that it was only after seeing Mr. Pleasant pull out of the lot without stopping at the sidewalk that he pulled onto the street and followed him. He performed the stop within a couple of blocks from where the infraction occurred.

He testified that when he contacted Mr. Pleasant and requested his driver's license, registration, and insurance, Mr. Pleasant produced his driver's license, but said he did not believe the registration or insurance information for the car, which belonged to his girlfriend, was in the vehicle. When Detective Jones suggested that he check the glove box, Mr. Pleasant declined. The detective returned to his car, ran Mr. Pleasant's name with dispatch, and learned that his driver's license was suspended. He returned to the car

_____

[1] At the time, former RCW 46.61.365 (1965) described the infraction as follows:

The driver of a vehicle within a business or residence district emerging from an alley, driveway or building shall stop such vehicle immediately prior to driving onto a sidewalk or onto the sidewalk area extending across any alleyway or driveway, and shall yield the right-of-way to any pedestrian as may be necessary to avoid collision, and upon entering the roadway shall yield the right-of-way to all vehicles approaching on said roadway.

7

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

and informed Mr. Pleasant that he was placing him under arrest for driving with license suspended (DWLS).

Detective Jones testified that Mr. Pleasant then asked what the bail would be for the DWLS charge and, when Detective Jones said he thought it would be $500, Mr. Pleasant asked if he could get the amount from his car and bail out. The detective responded that Mr. Pleasant could not return to the car, but the detective would retrieve the amount for him if he wanted to have it available on arriving at the jail. He testified that Mr. Pleasant said, "'Nevermind then.'" Report of Proceedings (RP) (No. 35645-1-III) (Mar. 21, 2017) at 11.

Detective Jones testified that he was made "a little suspicious" by Mr. Pleasant's refusal to check the glove box for the registration and proof of insurance and then declining the detective's offer to retrieve money so that he could bail out on arriving at jail. *Id.* at 12. He contacted his department's K-9 officer, who he knew was working that night, to come to his location and walk his dog around the car. Detective Jones testified that he had smelled marijuana in his interaction with Mr. Pleasant, but had not detected the presence of any narcotics. The K-9 officer arrived and rounded the car with his dog, Lemon, and then informed Detective Jones that Lemon had alerted, suggesting the presence of narcotics.

At that point, Detective Jones arranged for the car to be towed with the intention of applying for a search warrant. A search warrant was obtained, and a search of the car

8

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

the following morning led to the discovery of a large amount of cocaine in the glove box. $5,200 in cash was found bundled together with debit cards in Mr. Pleasant's name in or near the center console. Drug paraphernalia was also found in the car.

The prosecutor questioned Detective Jones about whether, in preparing for the suppression hearing, he determined how many times he had cited drivers the prior year for failing to stop at a sidewalk. The detective testified that he did, and determined he had cited drivers for the infraction 13 times in 2016. He testified he had probably *stopped* drivers for the infraction "[a]t least double that, maybe triple," but didn't always cite them. *Id.* at 8. In concluding her questioning, the prosecutor asked the detective, "[W]hat was the actual reason for the stop in this case?," to which Detective Jones responded, "It was failing to stop for the sidewalk before entering out into traffic." *Id.* at 14.

Defense counsel's cross-examination of Detective Jones in the suppression hearing is critical to whether Mr. Pleasant demonstrates actual prejudice from the failure to offer the dash cam recordings. For that reason, we quote it at length. After establishing that Detective Jones knew the defense had been provided with dash cam recordings, the detective was questioned by defense counsel and testified as follows:

> Q. So after watching the video, isn't it true to say that you had watched two individuals transact? You referenced one leaning in through the window and that you found that to be very suspicious and then you indicated to the—
> A. I said that on camera? I found that to be suspicious?

9

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

Q.  So much so that you had instructed another officer to see if they could track down the other individual that was talking to him leaning into the window; do you recall that?

A.  I recall mentioning the male that had left his vehicle.  However, in seeing the interaction between him and the other fella in the car was not the basis of my stop at that particular moment in time.  The—I did see it. I'm not going to deny that, but—but that was not my sole reason for pulling that vehicle over.

It probably got my attention, just like many interactions between people do every day, but I don't—I didn't feel the need to describe every single little part of what happens before I make every single stop or—or field contact.  It—and with that particular interaction between him and whoever was in the car was not my basis of the stop.  The basis of the stop was the infraction.

Q.  Would it surprise you that when you were about to pull him over, you had instructed another officer to go track down the person that was leaning into his vehicle to talk to him?

A.  Probably not, no.

So—so this is a common thing with the Street Crimes Unit.  We're always looking for something to do.  If there's a guy in the area and he's looking for a field contact or something to do, I'll mention, "There's a guy across the street if you want to go do a field contact."

Q.  Okay.  So, first and foremost, none of that did you mention before when you were describing this entire stop; is that right?

. . . .

A.  Nobody asked me about it until now, until you did.

Q.  But the State asked you about what happened—

. . . .

A.  She didn't ask me about the other male.  All I'm saying is you're the one that brought it up.

Q.  Gotcha.

Okay.  Now, once you had pulled him over, the dashboard camera indicates—shows other officers came on the scene; do you recall that?

A.  I do.

Q.  And there were some—some quiet conversations that was not quite picked up but there was a conversation with another officer that describes your—your breakdown of what had caused the initial stop.

Do you recall having that conversation with another officer?

10

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

A.  You're saying it caused the initial stop.  That's not my words, those are your words.  This—this is not what caused the stop.  The cause of the stop was the infraction on the sidewalk.  The other stuff I—I saw was just stuff that I saw.  It's—it's not the—the sole reason or the major reason for the stop.  The major reason for the stop was the—was the sidewalk.

Q.  But my question was: Did you describe, to the other officer, after the stop, which would be now Officer No. 2—

A.  Okay.

Q.  —that there was an interaction between him and another individual at the gas station which made you suspicious?

A.  I may have mentioned it, yeah.

Q.  Okay.  And you actually described, to the officer, that it was suspicious what they were doing?

A.  I don't recall if I used the word "suspicious" or not.

Q.  If you had noticed two individuals talking at a gas station would you, in your normal course of business, deem that suspicious?

A.  No.

It would depend on the totality of the circumstances.  I can't—I can't say what they were doing or why they were—why he had somebody in his vehicle.  I didn't—I can't attest to what they were doing.

Q.  So would it surprise you—and I had the video transcribed—that you would have said—described to the other officer, and that's the first officer, "Yeah.  He's on foot.  He came up to his car on foot and sat in the passenger-side seat.  And then he popped out and left the vehicle.  He then went back down Court."  And the other officer responded, "Yup.  I'm here."

You were spending a lot of time on describing what happened before your traffic infraction, to two officers, when you're now testifying that those pre-observations weren't important to you.  You're spending a lot of time sending officers there and describing it; isn't that right?

A.  So, like I said, with a proactive team, we're constantly looking for field contacts whether it be pedestrians, bicyclists, traffic stops, or whatever.

You can ask anybody.  We're constantly stopping people all day long.  And my focus was going to be on the car.  There were other people in the area.  I was describing the man that I saw.  And if they wanted to go do a field contact on the man, go for it, but I'm going—I'm going to go stop the car.

Q.  And just to clarify.

11

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

A. Sure.

Q. This is not two separate incidents or—this is still the man that was involved in this transaction so it—it's not as if he had said to you, "Hey, by the way, before I come down there, I'm seeing somebody very suspicious on 2nd and Court or 4th and Court."

This is the transaction that occurred here subsequent to your stop and you were referencing this particular individual?

A. Yes.

Q. Yes. So it—it wasn't as if you were instructing him to do a field stop on some—

A. I was describing the—the male that left the gas station, correct.

Q. Which was—who then left the gas station and was then pulled over, which was him so this is all connected to his particular incident or his stop that you have the other officer go investigate?

A. I—I thought we just clarified this.

Q. Well, one of the things that had me maybe not sure that we're on the same page, when you give another officer instruction to go check something out—

A. This wasn't an instruction, it was a suggestion.

Q. It was a suggestion?

A. He didn't have to go contact him if he didn't want to.

Q. I—I didn't want the Court to think that you were instructing him or suggesting for another or a separate incident?

A. It was a suggestion for a field contact if they were in the area. I described the male and his direction. If nobody was in the area or didn't want to go contact him, that was up to them. I was going to go make a stop on the vehicle.

Q. Okay. So let's summarize, then.

You're standing there. You're watching him. You see two males. One pops into the vehicle. And you describe one popping in the vehicle, the other popping out, and there's a conversation that's had between two individuals at a gas station. Then one of them pops out and runs off. My client, then, is the one left in the vehicle, comes onto the street, doesn't yield, and you get behind him; is that right?

A. He committed an infraction by not stopping at the sidewalk.

Q. Right.

A. I went over and pulled him over, correct.

Q. As you're behind him and you're describing the infraction and you're ready to take the infraction, you call back another officer and say,

12

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

"Check out the other guy that was—that I had noticed talking to this individual that I just pulled over."

A. I don't-I don't recall my exact words but it was a suggestion. Sure.

Q. To—

A. Sure.

Q. And then when you arrived, and the—in fact, Lemon had done his rounds, the officer came up to you and asked you to give a kind of 411 on what just went on and you said, "Well, I was at a gas station. I was monitoring. I saw these two guys interact and then I pulled them over for this infraction."

A. I don't—I don't know if I recall giving him all that background. I don't recall that, but I do recall giving him—

Q. Well, I can—I can tell you this.

A. Mm-hmm.

Q. Throughout the entire stop, I would say about 60 percent of your conversation with other law enforcement officers was referencing how— what he had done at the gas station that you thought was odd, and it—it seems like that's your sort of M.O., because you thought it was odd that he wouldn't let you get into a glove compartment. You thought it was odd. It's sort of your job to see the oddities in things and that—that's something you pointed out; isn't that right?

A. Mm-hmm.

Q. Am I wrong to describe your job as seeing something that's odd happening?

A. No, you're correct.

*Id.* at 20-28. The State did not object to this questioning at any point.

After hearing closing argument from the parties, the trial court denied the suppression motion. In orally ruling, the court stated,

The officer clearly testified, based on his training and experience, his citations in 2016, that he had written 13 citations for this very violation of RCW 46.61.365. Court will indicate that his testimony is credible.

Court will find that, based on that training and experience and the testimony of the officer, that the officer stopped Mr. Pleasant for violation of [RCW] 46.61.365, a traffic violation that is set forth in the statute.

13

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

*Id.* at 41.

The new evidence that Mr. Pleasant offers in support of his PRP is roughly one-half hour's worth of dash cam recordings that trial counsel had received from the State, identified as video 1 and video 2. The time stamps run from roughly 9:52 p.m. to 10:11 p.m. on video 1, and 10:11 p.m. to 10:29 p.m. on video 2.

In the brief in support of his petition, Mr. Pleasant describes what the recordings reveal and argues that the recordings capture statements by Detective Jones that could have changed the outcome of the suppression hearing. Only five statements or conversations he describes reveal Detective Jones's interest in more than the traffic infraction, and some express suspicion aroused after the stop. Mr. Pleasant did not have the recordings transcribed by a certified reporter or transcriptionist, but his appellate lawyer's transcription of the statements in her amended opening brief appears reasonable, and we rely on it.

Video 1 begins with the detective stopped behind Mr. Pleasant's car at a red light. He undertakes the traffic stop after the light turns green. It includes the following half-minute worth of audio that begins before completion of the stop:

> [Detective Jones]: Popping out of the gas station at 18 and Court in like two seconds probably.
>
> [Other officer]: So you want me to go back to 18th and Court?
>
> [Detective Jones]: Yeah he's on foot he came up to his car on foot and sat in the passenger's seat for a little bit and then popped out his car and left

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

and the black male then went into the store. He's going to be heading back
east down on Court.

Am. Br. in Support of PRP at 14; Ex. E, Video 1, at 31 sec. to 56 sec. Seconds later, the

second officer responds, "okay, I'm there." Am. Br. in Support of PRP at 14; Ex. E,

Video 1, at 1 min., 1 sec.

By 2 minutes and 59 seconds into video 1, Detective Jones has contacted Mr.

Pleasant, obtained his driver's license and returned to his car, when a male voice is heard

over the radio, "I'm not seeing him, man." Am. Br. in Support of PRP at 15; Ex. E,

Video 1, at 2 min., 59 sec. Detective Jones responds, "well, he might still be in the store,

I don't know. I'm going to need you back up here, actually, forget about the dude."

Am. Br. in Support of PRP at 15; Ex. E, Video 1, at 2 min. 59 sec. to 3 min., 14 sec.

A little over four minutes into video 1, an officer who has arrived has the

following exchange with Detective Jones, who is still in his patrol vehicle:

> [Unidentified officer]: [H]ey that was good timing, I was right there,
> I knew there was something off . . . (inaudible)
>
> [Detective Jones]: Yeah it was weird, dude, I was sitting there
> having a snack over there at Papa Murphy's this black dude comes running
> up from the east sits in the passenger seat for about two minutes he pops
> out of this car leaves then the black dude goes right into the store.

Am. Br. in Support of PRP at 16; Ex. E, Video 1, at 4 min., 15 sec. to 4 min., 36 sec.

Although not mentioned in Mr. Pleasant's brief, at about six and one-half minutes

into video 1, Mr. Pleasant tells Detective Jones that he has called his girlfriend, and she

15

No. 37905-1-III
*In re Pers. Restraint of Pleasant*


should be arriving in about five minutes to get her car. Ex. E, Video 1, at 6 min., 30 sec.

to 6 min., 51 sec.

About nine minutes into video 1, the following statements are made as Detective

Jones speaks with two other officers outside his car:

> [Detective Jones]: Yeah it smells like weed pretty good but I don't
> know . . . .
>         . . . .
> [Unidentified officer]: It's kind of funny that he is ready to pay for
> whatever the amount was . . . .
>         . . . .
> [Detective Jones]: I said sure, tell me where to grab it and he said,
> that's ok.

Am. Br. in Support of PRP at 17; Ex. E, Video 1, at 8 min., 45 sec. to 9 min., 11 sec.

Finally, several minutes into Video 2 (shown as 10:14:33 p.m. on the video)

Detective Jones approaches the K-9 officer as he gets out of his car and they have the

following conversation:

> [Detective Jones]: What's up, man? So the driver is Jerome
> Pleasant, he's under arrest for driving while license suspended. The
> original reason he caught my attention is because he was sitting at a gas
> pump at the Econo mart just down the street, or not the Econo mart, the
> Conoco at 18 and Court. So a black dude comes running up to him, looks
> around all suspiciously, jumps in the passenger seat, is there for like a
> minute, jumps back out of the passenger seat, he takes off . . . it's drug
> loitering.
> [K-9 officer]: Yeah, that's what it is.
> [Detective Jones]: He made several statements to me that made me
> believe he does not want me in the vehicle, cause he's saying like hey man,
> I can bail out right now, and I'm like yeah sure. I said let me get the money
> for you, I'll get it for you, just tell me where it is, and he goes, nah, that's

16

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

all right, forget it.  And I said how about insurance and registration, and he said it's not in here, and I said just look in the glove box, save yourself a ticket.  He goes, it's my girlfriend's and it's not in there, and he goes, nope, I'm good . . . it reeks of weed, I can smell it from here.  I don't know if he's got marijuana or something else.

> [K-9 officer]:  You think he's slinging other dope?

> [Detective Jones]:  I don't know if he's slinging or bought.

> [K-9 officer]:  Oh, that's true.  Well, we'll see.

Am. Br. in Support of PRP at 18-19; Ex. E, Video 2, at 3 min., 33 sec. to 4 min., 53 sec.

The State responds that these recorded statements are cumulative of Detective Jones's testimony at the suppression hearing, and the required prejudice cannot be demonstrated by evidence that is cumulative.[2]  At the suppression hearing, the State's direct examination of Detective Jones developed the evidence about what he considered suspicious conduct by Mr. Pleasant after the stop.  While the prosecutor did not question the detective about Mr. Pleasant's interaction with a passenger before the infraction, Detective Jones never dissembled about it in cross-examination.  He acknowledged all of the following:

- Before the traffic infraction, he saw the driver of the car have contact with the passenger ("I did see it.  I'm not going to deny that . . . .");
- Seeing the passenger interaction drew his attention to the car ("It probably got my attention . . . .");
- While performing the traffic stop, he suggested that one of his fellow officers see if he could locate and make a field contact with the passenger ("[I]t was a

---

[2] Neither party addresses whether the audio from the recording constitutes hearsay and, if so, whether an exception applies, so we do not analyze whether the audio was admissible only for impeachment.

17

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

> suggestion. Sure."; "I was describing the—the male that left the gas station, correct."; "It was a suggestion for a field contact if they were in the area. I described the male and his direction."; The street crimes unit is "a proactive team, we're constantly looking for field contacts . . . ."; "We're constantly stopping people all day long."); and

- He might have told other officers about the passenger interaction (he "may have mentioned" to a second officer seeing the suspicious contact with the passenger; that would "[p]robably not" surprise him; he "[did not] recall if [he] used the word 'suspicious' or not").

*See* RP (No. 35645-1-III) (Mar. 21, 2017) at 21-27.

We can see how a defense lawyer might think that the last statement identified above—Detective Jones's statement to the K-9 officer about "the original reason [Mr. Pleasant] caught my attention"—is a helpful sound bite, but the fact remains that it is consistent with the detective's testimony at the hearing.

Overall, the events and statements captured by the recordings confirm Detective Jones's testimony at the suppression hearing of how the traffic stop unfolded and why the detention extended beyond what would have been expected had there only been the moving violation. They confirm that Mr. Pleasant was promptly pulled over, within a couple of blocks of where Detective Jones saw him commit the infraction. They confirm that Mr. Pleasant's refusal to check the glove box for registration and proof of insurance seemed odd to the detective. They confirm that Mr. Pleasant's detention was delayed when he proved to be driving with a suspended license and was arrested. They confirm that Detective Jones found it suspicious that Mr. Pleasant quickly retreated from wanting to bail out if it meant having the detective enter the car. They confirm that Mr. Pleasant's

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

conduct when stopped caused the detective to summon the K-9 officer he knew was working. They establish that the K-9 officer had arrived and Lemon had alerted to Mr. Pleasant's car within less than 30 minutes of the stop, and before Mr. Pleasant's girlfriend arrived and could have assumed responsibility for the car.

As observed by this court in Mr. Pleasant's direct appeal, even under article I, section 7 of the Washington Constitution, a mixed-motive traffic stop will pass constitutional muster as long as the officer makes an independent, conscious determination to perform the stop in furtherance of traffic safety and the general welfare. *Pleasant*, slip op. at 6-7 (citing *Chacon Arreola*, 176 Wn.2d at 298-99). "[A] police officer cannot and should not be expected to simply ignore the fact that an appropriate and reasonably necessary traffic stop might also advance a related and more important police investigation." *Chacon Arreola*, 176 Wn.2d at 299.

The trial court found Detective Jones to be credible. It reasonably attached importance to the fact that the detective had cited drivers for the same infraction 13 times the previous year, and had likely conducted double or triple that number of stops for the infraction in that time frame. There is no reason to believe that the trial court would have analyzed the suppression issue differently had the dash cam recordings been offered. Because Mr. Pleasant is unable to demonstrate actual prejudice from his trial lawyer's choice not to offer the dash cam recordings, we need not address whether the choice constituted deficient representation.

19

No. 37905-1-III
*In re Pers. Restraint of Pleasant*


II.    THE SUPREME COURT'S DECISION IN *BLAKE* DOES NOT INVALIDATE THE 2016
       SEARCH WARRANT

Mr. Pleasant next contends that the search warrant for his vehicle is not supported

by probable cause because the statute criminalizing possession of controlled substances,

former RCW 69.50.4013, was found unconstitutional in *Blake.*  He relies on *State v.*

*White*, 97 Wn.2d 92, 640 P.2d 1061 (1982), a case dealing with an arrest based on an

unconstitutional statute.

Generally, while a conviction based on an unconstitutional statute will not stand,

the validity of an arrest based on an unconstitutional statute remains unaffected.  *State v.*

*Potter*, 129 Wn. App. 494, 497-98, 119 P.3d 877 (2005), *aff'd*, 156 Wn.2d 835, 132 P.3d

1089 (2006); *see also Michigan v. DeFillippo*, 443 U.S. 31, 37-38, 99 S. Ct. 2627, 61 L.

Ed. 2d 343 (1979).  As such, an arrest is not rendered "invalid for lack of probable cause

simply because the criminal statute a defendant is arrested under is later found to be

unconstitutional." *Potter*, 129 Wn. App. at 497.  Mr. Pleasant relies on an anomalous

outcome in *White*, but the result in that case is explained by the fact that while the stop-

and-identify statute on which White's arrest was based had not yet been invalidated, an

ordinance with substantially similar language had been found unconstitutional.  *White*

holds that a statute not yet judicially determined to be unconstitutional may be found "'so

grossly and flagrantly unconstitutional' *by virtue of a prior dispositive judicial holding*

that it may not serve as the basis of a valid arrest." 97 Wn.2d at 103 (emphasis added).

20

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

The court reasoned, "a person of reasonable prudence would be bound to see the flaws of [the statute]." *Id.*

As of 2016, no Washington decision served as a harbinger that former RCW 69.50.4013 would be invalidated. To the contrary, at the time Detective Jones applied for a search warrant, our Supreme Court had rejected a due process challenge to the statute. In *State v. Cleppe*, the Supreme Court relied on legislative history to conclude that the legislature did not intend to impose a mens rea element for an earlier version of RCW 69.50.4013. 96 Wn.2d 373, 378-80, 635 P.2d 435 (1981). In *State v. Bradshaw*, the Supreme Court confirmed that the unlawful possession statute does not have a mens rea element, and the eight-member majority declined to imply such an element. 152 Wn.2d 528, 532-37, 98 P.3d 1190 (2004). The court in *Bradshaw* also summarily rejected an argument that in the absence of a mens rea element, the unlawful possession statute violated due process, noting that the defendants "offer[ed] little analysis to support any of their constitutional arguments." *Id.* at 539. While Justice Gordon McCloud advocated for revisiting *Cleppe* and *Bradshaw* in 2019, in a concurring opinion in *State v. A.M.*, she was joined by only one other justice. 194 Wn.2d 33, 45, 448 P.3d 35 (2019) (Gordon McCloud, J., concurring).

After *Cleppe* and *Bradshaw*, some defendants convicted of simple possession still tried to advance due process challenges to the strict liability character of the crime in this court. Notwithstanding contrary case law from other jurisdictions, this court continued to

21

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

reject those challenges in light of *Cleppe* and *Bradshaw.  See, e.g.*, *State v. Schmeling*, 191 Wn. App. 795, 802, 365 P.3d 202 (2015); *State v. Pittman*, No. 36034-2-III, slip op. at 2-3 (Wash. Ct. App. Mar. 17, 2020) (unpublished)[3] (observing that *Cleppe* and *Bradshaw* "are binding on this court," (citing *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984))); *State v. A.M.*, No. 76758-5-I, slip op. at 8-10 (Wash. Ct. App. Jul. 30, 2018) (unpublished),[4] (observing that A.M.'s argument "contradicts settled authority"), *rev'd on other grounds*, 194 Wn.2d 33, 448 P.3d 35 (2019).

At the time Detective Jones sought a warrant to search Mr. Pleasant's car, persons of reasonable prudence would not have perceived former RCW 69.50.4013 as flawed in a way that made it unconstitutional.  Because a suspected violation of former RCW 69.50.4013 provided probable cause for the search warrant, we need not reach the State's argument that probable cause also existed to suspect that Mr. Pleasant had violated other, constitutional criminal statutes.

III.    REMAND IS REQUIRED FOR THE TRIAL COURT TO VACATE THE SIMPLE POSSESSION CONVICTION

The State agrees with Mr. Pleasant's argument that at a minimum, his simple possession conviction must be vacated in light of *Blake.*  An unconstitutional conviction

---

[3] Available at https://www.courts.wa.gov/opinions/pdf/360342_unp.pdf.

[4] Available at https://www.courts.wa.gov/opinions/pdf/767585.pdf.

No. 37905-1-III
*In re Pers. Restraint of Pleasant*

is an unlawful restraint and entitles one to relief on collateral review. RAP 16.4(c)(2);

*In re Pers. Restraint of Hinton*, 152 Wn.2d 853, 860, 100 P.3d 801 (2004).

We grant Mr. Pleasant's petition in part, remanding with directions to vacate his 2017 conviction for simple possession. His petition is otherwise denied.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Fearing, J.

23